**In the matter of Marvin W. DAVISON and Betty S. Davison, Debtors.**

**Bankruptcy No. 83–00699–SW–1–3.**

United States Bankruptcy Court, W.D. Missouri, W.D.

July 23, 1987.

Richard L. Knight, Overland Park, Kan., for debtors.

John M. Gibson, Kansas City, Mo., for The Law Firm of Campbell, Morgan, Gibson & Kramer, P.C.

Arthur B. Federman, Kansas City, Mo., trustee.

ORDER REVOKING COURT'S FORMER ORDERS GRANTING ATTORNEYS' FEES TO COUNSEL FOR DEBTORS AND DENYING PENDING APPLICATION OF COUNSEL FOR DEBTORS FOR AN AWARD OF ATTORNEY'S FEES

DENNIS J. STEWART, Chief Judge.

Currently pending before the court is the application of the law firm of Campbell, Morgan, Gibson & Kramer, P.C., for an award of attorney's fees in the sum of $17,278.00. The application was filed on November 10, 1986. A hearing on the application was held, pursuant to appropriate notice, on March 31, 1987. In that hearing, applicant counsel elected to rely upon the detailed statement submitted in support of the application, which has, since the hearing, been further modified to reflect the services which applicant counsel contends have been rendered "in aid of administration of the estate" within the meaning of *Randolph v. Scruggs,* 190 U.S. 533, 23 S.Ct. 710, 47 L.Ed. 1165 (1903).

 The bankruptcy court is obligated to rule independently on applications for attorney's fees even if those fees are consented to by all interested and affected parties.[1] It is further the duty of the bankruptcy court to compare the applications for attorney's fees with the files and records in the case and with the court's own knowledge of the case in determining the legality and reasonableness of any proposed award.[2] "A judge is presumed knowledgeable as to the fees charged by attorneys in general and as to the quality of legal work presented to him by particular attorneys; these presumptions obviate the need for expert testimony such as might establish the value of services rendered by doctors or engineers." *Lindy Bros. Builders of Phila. v. American R & S San. Corp.,* 487 F.2d 161, 169 (3d Cir. 1973). "[T]he determination of what constitutes reasonable compensation for services furnished by an attorney in a bankruptcy proceeding can be a distasteful task ... But this possibility does not excuse bankruptcy judges and district courts from conducting the thorough investigation that is necessary if they are to make their determination properly." *Matter of First Colonial Corp. of America,* 544 F.2d 1291, 1301 (5th Cir.1977). And in making its review of the proposed award, it is the office of the court initially to determine whether there is some disqualification or misconduct of

---

1. "(O)nly the court has the authority to determine the reasonableness of fees in any particular instance." 2 Collier on Bankruptcy para. 330.05, p. 330–24, n. 12 (15th ed. 1987).

2. "The trial judge should closely observe the attorney's work product, his preparation, and general ability before the court. The trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration." *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 718 (5th Cir. 1974).

counsel which would bar the awarding of any and all fees. "Neither creditors nor other parties in interest have the power to bind the court in the exercise of its discretion as to allowances. Creditor consent may, in practice, influence the court and help to overcome its doubts, but the final word is that of the court and it may disregard the creditors' assent as well as the testimony of expert witnesses, or counsel's agreement, or an administrative agency's recommendations." 4 Collier on Bankruptcy ¶ 62.05(3), pp. 1429, 1430 (14th ed. 1975). And see § 327 of the Bankruptcy Code.

▇ The authorities are further agreed that misconduct of counsel constitutes a sufficient reason for denying any and all attorney's fees to applicant counsel. "Improper conduct on the part of officers or attorneys has frequently been penalized by withholding compensation or reimbursement or both. Not only the statute and the Rules provide for this type of penalty, but courts have repeatedly used it as the most effective weapon against malpractice, ..." 3A Collier on Bankruptcy ¶ 62.05, p. 1431 (14th ed. 1975). And it is misconduct of counsel to aid and abet the dissipation of the funds and assets of a bankruptcy estate[3], or to incur obligations without authority.[4]

The files and records in this case clearly show that, almost throughout the chapter 11 proceedings which preceded the current chapter 7 proceedings, the debtors-in-possession continued to incur credit without formal authorization of court and without paying the indebtedness as they were incurred. In this manner, nearly $800,000 in postpetition unpaid indebtedness was built up. As this court found in an adversary action earlier brought by the trustee in bankruptcy to deny the discharge of the debtors, *Federman v. Davison*, 73 B.R. 726 (Bkrtcy.W.D.Mo.1987):

"Beginning with (August 1983), the debtors failed to list the debts incurred and unpaid; that they thereafter continued to fail to list the ever-growing debts incurred—inventory purchases, mostly, but also some sizeable obligations to relatives and others on account of loans which were extended to them—until, at the time of conversion of the chapter 11 proceedings to chapter 7 proceedings on September 10, 1985, the incurred but unpaid indebtedness had reached a figure totaling in excess of $800,000.... [T]he debtors ... had made disclosures [otherwise] in the monthly operating reports which should have plainly indicated that monthly purchases of inventory vastly exceeded monthly payments thereon.... When the unpaid accounts payable were being incurred at a stupendous rate ..., as they were in this case, it seems that even the most superficial attention to them would have resulted in the court's taking some appropriate action."

The continued incurring of postpetition indebtedness which was not immediately paid was contrary to the law of this district. See, e.g. *Matter of Isis Foods, Inc.*, 19 B.R. 329, 330, 331 (Bkrtcy.W.D.Mo.1982), affirmed, 27 B.R. 156 (W.D.Mo.1982), to the following effect:

"[F]or the court initially to grant the [debtor] this unqualified power to operate the business and the necessary power to make agreements to pay expenses as they currently arise and then, later, to refuse to enforce those agreements according to their clear and admitted terms would be a fraud upon those who are encouraged under the aegis of the bankruptcy court to do business with a chapter 11 debtor. The proposition is too fundamental that the bankruptcy court should not and cannot make itself a party to such a fraud. And such would stultify the purpose and intent of the ... provisions of the modern bankruptcy law, which is to encourage the rehabilita-

---

**3.** It is also said that, "where the quality of the services rendered is poor or *the size of the estate is insufficient* to satisfy the claims of creditors, allowances of compensation should be accordingly reduced." 2 Collier on Bankruptcy para. 330.05, pp. 330–31, 330–32 (15th ed. 1987).

**4.** "The taking of attorney's fees (or expending monies of the estate or undertaking unauthorized obligations) ... is unlawful and provides grounds for not awarding fees at all." *Matter of Midwestern Companies, Inc.*, 55 B.R. 856, 859 (Bkrtcy.W.D.Mo.1985).

tion of an honest chapter 11 entity, rather than to permit that entity to victimize those who attempt to fulfill the purpose of rehabilitation by doing business with the chapter 11 debtor. If the agreement were not enforced, the word would rapidly go forth that no person might safely do business with a chapter 11 entity, regardless of the assurances given him by that entity, and all the rest of the provisions of that chapter would accordingly become an unuseable dead letter."

See also *Matter of Midwestern Companies, Inc.*, 55 B.R. 856, 858 (Bkrtcy.W.D. Mo.1985) ("[A]ccording to the law of this district, those who supply goods and services to a debtor according to agreements made by the debtor postpetition in the exercise of its powers under sections 1107 and 1108 of the Bankruptcy Code are to be paid forthwith, in accordance with the terms of the contracts made.") To permit a chapter 11 debtor, without authorization of the court, to build up postpetition long-term indebtedness would clearly defeat the whole purpose of reorganization by permitting the debtor simply to shift his indebtedness from one set of creditors to another. It has an even more pernicious and perva-

sive effect when, as in the case at bar, the incurring of such long term postpetition indebtedness does not result in payment of any sums at all to the prepetition creditors. Chapter 11 was not intended to be used as both a sword and a shield against all creditors in such a manner. Such machinations make a mockery of the ideal of fair and even handed treatment of both the debtors and creditors which is the acknowledged and established purpose of such proceedings.

Further, in this case, the value of the assets which the trustee has been able to collect since the date of conversion of the chapter 11 proceedings to chapter 7 proceedings are not sufficient to cover the postpetition indebtedness thus incurred plus the postconversion administrative expense necessarily incurred by the trustee (which, he reports, have an approximate total of $778,248.18) and the attorney's fees of the applicant law firm, which, considering the prior applications together with the application at bar, total $145,100.66. The following is a diagrammatic breakdown of the successive attorney's fees requests:

| Date filed | Amount requested | Date of order | Amount of interim award |
|---|---|---|---|
| 8/30/83 | $33,765.45 | 11/10/83 | full amount requested |
| 11/8/83 | $ 6,576.43 supplemental | 11/10/83 | $40,341.88 |
| 11/20/85 | $87,480.78 | 12/23/85 | $42,144.00 + $ 1,893.00 expenses |
| 11/10/86 | $17,278.00 | none to date | n/a |

Attorneys of chapter 11 debtors may receive compensation from a chapter 7 estate after conversion from chapter 11. *In re Designaire Modular Home Corp.* 517 F.2d 1015, 1016 (3d Cir.1975). But the compensation may correctly be diminished because of the lack of success of the chapter 11 proceedings. See *In re Casco Fashions, Inc.*, 490 F.2d 1197, 1204 (2nd Cir.1973). And if the plan under chapter 11 has been wholly unfair to the creditors, it is within the vast ambit of the court's power to deny compensation altogether. See *Id.* at 1204, to the following effect:

"To be sure, if a court finds that a Ch. XI proceeding was filed without any reasonable prospect of success or in an effort to head off an inevitable adjudication of bankruptcy, compensation to a debtor's attorneys should be denied. It may also be ... that services in formulating an arrangement that was not accepted should not be compensated ..., or should be compensated only at subnormal rates; certainly this should be true if the proposed arrangement was so unfair that creditors could not be expected to accept."

For the reasons stated above, the court can only conclude that the chapter 11 plan of the debtors operated in a manner which was wholly unfair to the entire range of creditors. Because of the rapid expansion of long term credit during the period of the chapter 11 proceedings, nothing could be offered to any of the creditors and all that was accomplished was the creation of a new and considerable set of additional creditors to compete for the relatively small amounts which are now in the custody of the trustee in bankruptcy. And the court is now faced with the wholly unpalatable circumstances of having to choose which of two postpetition sets of creditors—preconversion or postconversion—receive the miserable spoils which remain, with both sides having the facile ability to cite decisions of nearly equal logical force in their favor.[5]

It is interesting to observe that, in the course of trial of the trustee's objection to discharge of the debtors, see *Federman v. Davison*, 73 B.R. 726 (Bkrtcy.W.D.Mo. 1987), it was one of the contentions of the trustee that the debtors' discharges should be denied because they failed to report the ever-increasing incurred but unpaid long-term indebtedness. The argument of counsel for the debtors in opposing the objection to discharge on this ground was that the expansion of long-term debt should have been evident from the contents of the monthly operating reports which were filed by the debtor inasmuch as those reports detailed the purchase of inventory and that which was paid for. The difference between those two amounts, counsel argued, should have been readily perceived as the debt incurred but not paid. The same argument is applicable with respect to counsel themselves, who should have known, if they in fact did not know, that the chapter 11 proceedings were being unlawfully manipulated by the debtor in this respect.

Counsel, however, did nothing to stop this wholesale abuse of the chapter 11 process. The files and records in this case show that they, even viewing their conduct in the light most favorable to them, did no more than ignore this ever-widening incurring of new credit which, it was obvious, could not be paid. And there were other circumstances which should have alerted counsel to the fact that the chapter 11 proceedings could not be prosecuted in this manner. Counsel induced some suppliers to ship supplies to the debtors by obtaining orders from the court for their immediate payment.[6] Nevertheless, those orders were not abided by the debtors and counsel

---

**5.** See this court's former ruling in *BDH Rock of Monmouth, Illinois v. Federman*, 79 B.R. 855 1987, in this case, in which it was observed as follows: "These figures demonstrate the unpalatable situation with which the court is faced in ruling on claims such as that at bar. The debtors have, in substance, by running up a total of $800,000 in postpetition indebtedness, created a new class of creditors and have used the chapter 11 proceedings to hold off their prepetition creditors while doing so. They abused the chapter 11 process, not only to frustrate its primary purpose—the ultimate payment of prepetition creditors—but also to enrich themselves to the extent that they received inventory without paying for it. It seems astonishing to this court, in retrospect, that responsible officers of any court could stand by and tolerate such an outrageous result gradually but certainly to be effected, as it was in this case.... This insidious process now leaves the court with the Hobson's choice of either further subdividing by one-sixth the distribution which would otherwise have been available to the creditors or else excluding either the prepetition creditors or postpetition creditors, one or the other, from any distribution at all in favor of paying all the funds on hand to the other class of creditors. And, it must be mentioned, counsel for the debtor ... have filed applications for awards of attorney's fees which would reduce by an additional $145,-100.66 the amount which would otherwise be available for creditors."

**6.** For example, "the files and records in this case ... show that, on June 10, 1983, some five months before the entry of the order of confirmation of the debtors' chapter 11 plan, Judge Barker entered an order authorizing the purchase of inventory on a consignment basis from the claimant. In his order of that date, Judge Barker stated as follows: '(T)hat Debtors may accept consignment merchandise from BDH Rock of Monmouth, Illinois and further, that Debtors may pay BDH Rock for the merchandise shipped to Debtors by BDH and sold by Debtors on a daily basis.' " *BDH Rock of Monmouth, Illinois v. Federman*, July 6, 1987. BDH Rock of Monmouth, however, like the other postconversion and postpetition suppliers, was not paid. The files and records in this case show that the execution of this order by the court was procured by applicant counsel.

did not ensure that they were abided.[7] Counsel further defended motions for the appointment of a trustee and to convert the chapter 11 proceedings when those motions were in part predicated upon the fact of steady proliferation of postpetition debt.[8]

This type of practice, moreover, strikes at the very heart of the bankruptcy system. As this court has stated on prior occasions, in *Matter of Isis Foods, supra,* and other cases, the nonpayment of postpetition creditors in chapter 11 cases, if acquiesced in by the court[9], can only create a situation in which suppliers are reluctant or unwilling to do business with a chapter 11 entity except for cash on the barrelhead, a situation which deprives chapter 11 debtors of the short term credit terms which almost all of them need. The court's endorsement of the practices which have occurred in this case would almost certainly result in the provisions of chapter 11 becoming an "unusable dead letter" as described in *Matter of Isis Foods, supra.*

This court refuses to do so. The manipulation of chapter 11 proceedings so as to dissipate assets which may otherwise be available to creditors is recognized as a species of misconduct which may justify the denial of attorney's fees or other professional fees.[10] The ambit of court power in this regard is generally recognized to be ample. "The court is expected to prevent expenditure which it deems unnecessary, by timely inhibiting its incidence ... On principles either of equity or analogy they withhold allowance where a claimant's alleged services are tainted with a breach of trust or other grave misconduct." Collier on Bankruptcy ¶ 62.04[3], p. 1421 (14th ed. 1978). These principles apply squarely and literally to this case in which the unlimited incurring of postpetition debt has taken the assets of the estate away from their rightful distributees, the prepetition creditors. In the mere exercise of good conscience, therefore, this court cannot hesitate to apply these principles even though it means the awarding of no fees to the applicant law firm for the entire case. The prior awards which were made by Judge Barker were not collected by the applicant law firm and were, moreover, in the nature of interim awards which are reviewable later in the course of case administration so as to ensure that the final award is made on a deliberate retrospective view of how that administration progressed.[11]

In so holding, the court takes no exception to the individual performance of successor counsel for the debtor, but only observes that none of the services for which

7. See note 5, *supra.*

8. As early as March 7, 1985, some of the unsecured creditors' committee moved for conversion of the chapter 11 proceedings to chapter 7 proceedings, stating, *inter alia,* that "as of the date of filing of this motion, debtors have paid no one but themselves, have lost over $500,-000.00 in the operation, have incurred extensive administrative expenses, and have admitted that they cannot carry out the plan." In opposing the motion for conversion, in a brief filed on March 26, 1985, the debtors did not deny that they had run up postpetition expenses to the extent of approximately $500,000 but stated that they may obtain financing any moment. It was, resultingly, not until September 10, 1985—and some $300,000 in additional postpetition expenses later—that conversion to chapter 7 actually took place.

9. As the record shows was the case at bar. See *Federman v. Davison,* 73 B.R. 726 (Bkrtcy.W.D. Mo.1987), to the following relevant effect: "In this particular, ... this court agrees with the contentions of the debtors, made in the course of trial, to the effect that they had made disclosures in the monthly operating reports which should have plainly indicated that monthly purchases of inventory vastly exceeded monthly payments thereon. So Judge Barker, contrary to his deposition testimony, either knew or should have known that considerable amounts of accounts payable were being built up. And, contrary to his testimony, he did not do anything about it."

10. See note 4, *supra.*

11. "It is only at the conclusion of the case that a determination of the full value of the services performed by the particular professional or fiduciary can be made, since only then is a thorough analysis by the court of the various relevant factos set forth in section 330 possible.... To the extent that future adjustments are required, interim allowances are always subject to the court's re-examination and adjustment during the course of the case as all expenses of administration must receive the court's final scrutiny and approval." 2 Collier on Bankruptcy para. 331.03, pp. 331–8, 331–9 (15th ed. 1987).

compensation has been sought in the most recent application before the court can be lawfully classified as services rendered "in aid of administration of the estate," the standard which controls in determining whether counsel for a chapter 7 debtor may be compensated from a chapter 7 estate.[12]

The court recognizes that this ruling is almost certain to give offense to those elements of the bar which generally champion a "right" of counsel to command an award of attorney's fees from a bankruptcy estate upon their making claim therefor. And it well may be the case that such elements have the political power to snuff out the tenure of a bankruptcy judge. Nevertheless, this court could not, in good conscience, reach any decision other than that which it reaches today. The bankruptcy courts are at that juncture in history when they have an opportunity to go forward into an era of public service and benefit rather than backward toward that day of "extravagant costs of administration in the winding up of estates in bankruptcy" which have long been denounced as "crying evils." *Realty Corp. v. O'Connor*, 295 U.S. 295, 299, 55 S.Ct. 663, 664, 79 L.Ed. 1446 (1935). In prior decisions, the court has made note of the crucial importance of the bankruptcy process to our democratic institutions and the adverse consequences which may attend the giving over of that process to those who would abuse it. See, e.g., *Matter of Bruno*, 68 B.R. 101, 103 (Bkrtcy.W.D.Mo.1986) to the following effect:

"The framers of our national constitution penned the bankruptcy power into its articles as one of the most significant—if, indeed, not the most significant—of the protections of our way of life. The fundamental and paramount importance of bankruptcy laws can quickly be grasped if one simply contemplates a system in which each citizen was permitted only one economic life and in which any single economic failure would make one a debtor for life, or nearly so, regardless of the potential future benefits to himself and his society which his industry and innovative genius might otherwise have created. Such a legal system would frustrate and still the creative spirit which lies at the heart of our democratic society. On the other hand, however, if the bankruptcy process is permitted to be abused by those whose purposes are not in consonance with this ideal, the effect tends to be the same as if proper use of the bankruptcy laws were wholly suppressed. For the bad reputation of the bankruptcy system which thus develops discourages its use by those who would prefer to preserve some semblance of their good name."

Accordingly, it is hereby,

ORDERED that the courts former orders granting attorneys' fees to counsel for debtors be, and they are hereby, revoked. It is further

ORDERED that the pending application of counsel for debtors for an award of attorney's fees be, and it is hereby, denied.

---

**12.** In his application which is before the court, transmitted to the court by means of his letter of April 16, 1987, successor counsel for the debtors is able to demonstrate that he cooperated with the trustee on several efforts and that he performed duties which may be compensable in connection with filing new schedules, attending a new meeting of creditors and so forth. But the value of these services falls well within the $15,000 retainer which was taken. Consequently, this court views the matter of how the retainer should be split among former counsel for the debtor and successor counsel to be strictly a matter between them, *unless* the trustee commences an action pursuant to Bankruptcy Rule 2017 to recover all or part of the retainer. If the trustee commences such an action, it well may be within the jurisdiction and power of this court to determine precisely how the $15,000 retainer should be divided between debtors' former counsel and successor counsel.