**In the Matter of the MIDWESTERN COMPANIES, INC., Titan Energy Engineering, Inc. and Titan Energy, Inc., Debtors.**

Bankruptcy Nos. 84–01679–SW–11, 84–01666–SW–11 and 84–01663–SW–11.

United States Bankruptcy Court, W.D. Missouri, Southwestern Division.

Dec. 5, 1985.

See also 49 B.R. 98 and 47 B.R. 16.

Van Oliver, Akin, Gump, Strauss, Hauer, & Feld, Dallas, Tex., for debtors.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL ORDER DENYING CONFIRMATION OF PLANS OF REORGANIZATION

DENNIS J. STEWART, Bankruptcy Judge.

*Preamble and Findings of Fact*

The three cases which are now before the court for consideration of confirmation of the debtors' proposed plans of reorganization were born in difficulty, have had a troubled history throughout the period of their processing in the chapter 11 court, and now are presented to the court under circumstances so troublesome and unpromising that the court has no alternative except to deny confirmation of the respective plans. Each of the three debtors claims ownership rights in a set of ethanol plants—located near Roswell and Clovis, New Mexico, and New Iberia, Louisiana—and the rights to participation in the revenues produced by the operations of the plants. At the present time, the plants, according to the evidence which has been presented, are not being operated nor are they yet operable. An investment of about $9 million is necessary for the commencement of operations, according to the proponents of the plans which have been presented to the court. In the course of the confirmation hearings which were held in Joplin, Missouri, on November 27, 1985, they adduced evidence to the effect that certain lending institutions had made so-called "commitments" to loan the debtors monies approximating that amount, but the "commitments," with respect to virtually all the potential lenders were, in reality, only indications of interest and so surrounded by qualifications and contingencies that they could hardly accurately be described as commitments at all. With respect to one chief among the potential lenders, the Fi-

delity Bank of Philadelphia, they indicate an intention to lend some $4.245 million on a myriad of conditions, the principal conditions being that all pending lawsuits against one of the subsidiaries of the debtor be resolved before the decision to commit is made.[1] The proponents of the plan, in the confirmation hearing of November 27, 1985, offered testimony to the effect that the conditions and contingencies prerequisite to commitment would be resolved within the next 90 days or that they would never be resolved at all.[2] And, in speaking in the same hearing in favor of confirmation of the plan, the attorney for National Union Fire Insurance Company characterized the promise of this admittedly crucial loan as one which would either materialize or vanish within the next 90 days. Nevertheless, the proponents of the plans, for reasons which are explained principally in terms of a desire to have done with this matter, request that the court not wait until the potential lenders make definite decisions as to whether they will commit themselves to making the loans. An immediate decision on confirmation is necessary,

they say, because the potential lenders will not determine whether definitely to commit capital until a confirmed plan is actually in effect as the result of a final, unappealed and unappealable order of confirmation.

The lenders, however, if and when they decide to make commitments to the debtors, are to take priority postpetition liens on the property of the estate.[3] In so doing, they displace other creditors, among them certain bondholders who have been said to have agreed to subordination of their secured claims by a vote of 20 to 1 in numbers of voters. Accordingly, their representatives have voted for confirmation of the plans of reorganization and have advocated confirmation in the hearings held by this court. But the potential lenders will also displace a class of creditors who have the natural and legal first priority under law, the mechanics' and materialmens' lienholders—those whose labors and services have brought the ethanol plants themselves into their present status and who, according to the relevant plans, are consigned either to an inferior status or to a long and

1. According to the relevant text of the letter of September 11, 1985, from the Fidelity Bank of Philadelphia to Butcher Capital Markets, the "Fidelity Bank, N.A. ... has approved a loan commitment in the maximum amount of $4,250 ... to Ethanol Energy Partners ..., Ethanol Partners Accredited ... and/or a joint venture to be formed among EEP, EPA and Titan Energy, Inc. ... all subject to the terms and conditions described below ... No litigation or proceeding shall be pending or threatened against EEP, EPA, and/or PB Joint Venture which might adversely affect EEP, EPA and/or PB Joint Venture each one's respective financial condition, operations or prospects, including but not limited to, any litigation brought by Titan against EEP and/or EPA, any litigation brought by the limited partners of EEP and/or EPA, or any litigation brought against any joint venturer by the Internal Revenue Service, M.A. Patout & Son, Ltd. or any mechanics' or materialmen's claimant." The evidence adduced in the course of the confirmation hearing shows that there is still pending litigation which would come within this condition. In an effort to demonstrate that this condition could be met, the proponents of the plan adduced the testimony of Howard Bruce Scherer, the executive vice president of Butcher Capital Markets, Inc., who admitted that there was a whole panoply of suits still pending which prevented any showing

that this condition had been met. His testimony was further to the effect that, there might be a reasonable probability that the condition might be met within the next 90 days, but he cited no persuasive facts in support of his opinion. And his conclusionary statement to this effect was diluted by his further statements that, if there were no resolution of the outstanding suits within the next 90 days, there would never be any resolution at all and that the "only way to resolve ... is to have the plants up and running," which the evidence shows is wholly unlikely to be accomplished unless the money is first made available.

2. See note 1, *supra.*

3. The various commitments purport to select various parts of the estate as their security. That sent out by Fidelity Bank, N.A., for instance, cf. note 1, *supra,* requests a first security interest in the form of "leasehold mortgages on all real property to be leased to any of EEP, EEA, Titan and PB Joint Venture by M.A. Patout & Son, Inc." According to the amended disclosure statement, "Class III allowed claims," which are "those claims secured by property of the Debtors" have priority over the bondholder claims and those of all classes except class 1 and 2 priority claims.

arduous process of lien enforcement in state courts, a process which will be opposed in the same state courts by the debtors, even though it is postulated in the proposed plans of reorganization that the liens of the mechanics and materialmen are valid and perfected and the offers of the representatives of some of this class of creditors to demonstrate such evidentiarily has not been opposed by the debtors.[4]

Further, the efforts of those who have, since the inception of these chapter 11 proceedings, been proselytized by the current managing officers of the debtor corporation—and, perhaps even more importantly, those officers who would continue to control the affairs of the debtor corporations—to perform services for the debtor corporation, may or may not be paid for their services. Insofar as the detail of these proposed plans is concerned, the matter of their payment is left wholly to the discretion of the managing officers of the debtor. This is so, even though, according to the law of this district, those who supply goods and services to a debtor according to agreements made by the debtor postpetition in the exercise of its powers under §§ 1107 and 1108 of the Bankruptcy Code are to be paid forthwith, in accordance with the terms of the contracts made. See *Matter of Isis Foods, Inc.*, 19 B.R. 329, 330 (Bkrtcy.W.D.Mo.1982), affirmed, 27 B.R. 156 (W.D.Mo.1982). This court then observed that:

"for the court initially to grant the chief executive officer this unqualified power to operate the business and the neces-

sary power to make agreements to pay expenses as they currently arise and then, later, to refuse to enforce those agreements according to their clear and admitted terms would be a fraud upon those who are encouraged under the aegis of the bankruptcy court to do business with a chapter 11 debtor ... Such would stultify the purpose and intent ... of the modern bankruptcy law, which is to encourage the rehabilitation of an honest chapter 11 entity, rather than to permit that entity to victimize those who attempt to fulfill the purpose of rehabilitation by doing business with the chapter 11 debtor. If the agreement were not enforced, the word would rapidly go forth that no person might safely do business with a chapter 11 entity, regardless of the assurances given him by that entity, and all the rest of the provisions of that chapter would accordingly become an unusable dead letter."

In accordance with these principles, this court, during the pre-confirmation-hearing processing of this case, directed the debtors and their managing officers to pay three separate entities with whom they had made postpetition contracts for services and whom, after the services were admittedly performed fully and satisfactorily, they refused to pay.[5] It was the initial contention of counsel for debtors, in refusing to make such payments, that the debtors "did not have the money" to make such payments. But, as is further elaborated below, the files and records of the

---

4. In fact, subordination of the claims of the mechanics and materialmen is sought to be justified on the grounds that they retain all their rights under the general law by virtue of being permitted to pursue enforcement of their liens in state courts even as the property against which they hold liens is being used for the production of revenue to satisfy priority claims and the claims of others which are inferior to the claims of the mechanics and materialmen. This seems particularly unfair when the Roswell lienholders have offered uncontradicted proof in the course of the confirmation hearing of the prior status of their liens and the others are, in fact, conceded such status by the admission that they must receive their rights under the general

law and in the failure to object to claims which have a prima facie evidentiary effect.

5. On June 14, 1985, this court issued its order directing the debtors to pay A.H. Walker and Company the sum of $12,197.96 plus 9% interest within 30 days of that date. On November 6, 1985, the court directed that the debtors pay the claim of Joseph D. McMillan in the sum of $16,740.89 and, by the contents of the order, designated Joseph Bishop as the agent of the debtors to pay the "same sum forthwith to claimant as a prerequisite to confirmation of any plan of reorganization." The court also recently ordered the cure of payments on an executory lease which the debtor corporations purported to affirm and accept.

prior proceedings in these cases show that counsel for the debtors admit having the sum of about $50,000 in their possession which they had taken from the estate [6] without authorization from the court and without requesting such authorization. When confronted with the rejoinder to that effect at the inception of the confirmation hearing of November 27, 1985, counsel for the debtors made no present offer to pay these offended creditors. Rather, they reiterated their refusal to obey the court's prior orders and stated that they would only consider making the payments if and when the court confirmed the proposed plans of reorganization which are currently before the court. Nevertheless, it must be noted that the orders of the court directing these payments are final and unappealed.[7] The time for appeal from them has long since run out. It is contempt of court for counsel and the managing officers to continue to disobey these orders.[8] "[D]isobedience as a method of testing the court order ... lacks precedential support for the reason that the great weight of authority holds it to be inappropriate." *Norman Bridge Co. v. Banner*, 529 F.2d 822, 839 (5th Cir.1976).

The taking of the attorney's fees without authorization of the court and, in fact, without so much as informing the court that the fees were being taken, is unlawful and provides grounds for not awarding fees at all.[9] Such conduct is characterized in decisional law as a nearly inexpiable abuse.[10] In some instances, it has been regarded as criminal conduct. See, e.g., *United States v. Zipkin*, 729 F.2d 384 (6th Cir.1984).[11] And the circumstances of this case are surrounded by egregious circumstances. On at least one occasion after counsel for the debtors had taken these fees, the court inquired of counsel, in chambers, prior to the hearing scheduled for March 15, 1985, on the application of A.H. Walker and Company as to whether counsel for the debtors had been paid any monies in connection with these chapter 11 proceedings. The answer was an unequivocal denial. But later, on May 31, 1985, when the court posed the question to counsel in open court, it was admitted that some $50,000 had been taken from a subsidiary of the debtor corporation as and for attorney's fees, without authorization and without so much as prior notification of the court. The court thereupon instructed counsel to hold the funds in trust so that they remained property of the chapter estate. There have been other significant lapses in the performance of counsel and

---

**6.** Counsel stated that the payment was received from funds contributed by a subsidiary. But these were funds which were necessarily contributed to the debtor corporations and, upon contribution, became their property. Prior to May 31, 1985, they were never accounted for by the debtor corporations nor any of the officers, nor was the receipt thereof reported to the court.

**7.** The dates of the orders entered, see note 5, *supra*, conclusively demonstrate that more than 10 days has run since the issuance of each of them.

**8.** This is especially so when the continued possession of the unapproved compensation to Mr. Bishop and the law firm of Akin, Gump, Strauss, Hauer and Feld could conceivably be lawful only if its custodians dealt with in a manner which is in accordance with the directives of the court.

**9.** "The Court of Appeals in *In re Arlan's Department Stores, Inc.*, 615 F.2d 925 (2d Cir.1979), and *In re Futuronics Corporation*, 655 F.2d 463,

4 C.B.C.2d 1277 (2d Cir.1981), held that the attorneys for the debtor and debtor in possession were not entitled to any compensation despite the services rendered because of their failure to make adequate disclosure under former Bankruptcy Rule 219. The disclosure requirements of Bankruptcy Rule 2016 are designed to implement the compensation provisions of the Code and compliance therewith is required." 2 Collier on Bankruptcy para. 330.03, pp. 330–7, 330–8 (1985).

**10.** The misconduct is thought to be especially odious where "the bankruptcy court is not informed of the retainer agreement until ... years after the entry of the order approving the ... firm's retention." *Matter of Futuronics Corp.*, 655 F.2d 463, 469 (2d Cir.1981). In this case, counsel were retained nearly a year before the inadequate disclosure, made on May 31, 1985, of their having taken a retainer fee.

**11.** In *Zipkin*, the conviction was reversed, but on the basis of an error in the admission in evidence only.

the management for the debtors in the course of the processing of the case at bar. Time permits the recounting of only a few in conjunction with this order—the obtaining of an order for an early bar date from the court on a false promise that it should be regarded as only a hortatory order and the court would be permitted to extend the date within its discretion [12]; the failure and refusal of counsel for the debtors to include provisions concerning notice of the time for filing objections to confirmation and the conditional nature of the court's approval of the disclosure statement in the notice initially transmitted to creditors setting a confirmation hearing [13]; and the attempt to influence this court to enter an order, ex parte and without hearing or notice, granting counsel for the debtor corporations a lien on all the property of the debtor corporations for satisfaction of their attorneys' fees. The last mentioned impropriety was committed on or about July 11, 1985, when the court held a hearing on whether a claim filed after the bar date established by the abovementioned order should be permitted to be filed out of time.[14] At that time, counsel for the debtor placed before the undersigned in chambers a form of order which would have

granted them a lien in all the property of the estate, displacing other existing liens in the process.[15] The court declined to sign the order upon its presentation and informed counsel that an appropriate order ruling on the request according to governing legal principles would be filed at a later date. Subsequently, on July 25, 1985, this court issued its order in writing denying the request under the law which it deemed applicable.[16] At the time of the issuance of that order, the deadline for the debtors' submission of a proposed amended plan and disclosure statement had been established as July 31, 1985. Accordingly, between the time of its issuance and July 31, 1985, counsel for the debtors importuned the undersigned by telephone, ex parte,[17] stating that it was absolutely necessary for the undersigned to "change" or "reverse" the order denying the lien for attorney's fees if the disclosure statement was to be filed and distributed; that the law firm of which counsel for the debtors was a member would not otherwise permit the filing and mailing of the proposed disclosure statement. The court refused to "change" or "reverse" its prior order, and the threat not to submit and serve the proposed dis-

12. Counsel in the past have contended that they did not intend to convey to the court the notion that the order would be considered hortatory only; that there would be no reason to have a bar date which was not mandatory in character. But this was done to ease the court's reluctance to set an early bar date which would be regarded as engraved in stone. Counsel therefore made the promise clearly and unequivocally that the court might extend the order in its discretion and that, for the time being, a hortatory bar date would be sufficient.

13. This was done even though the court explicitly notified counsel by telephone that it had altered the form order submitted by counsel to the court on October 9, 1985, and that the notice transmitted must contain these alterations.

14. The claimant in this hearing was Arizia Energy, Inc.

15. The order which was placed before the court and on which signature was demanded was so broad that it would have constituted the grant of a superpriority lien without notice or hearing. The court further found in the order of July 25, 1985, however, denying the motion, that

"(t)he schedules in these cases do not clearly show that there is property which is unencumbered and which would be free now to be subjected to the proposed lien. But even if there were, this court subscribes to the rule of In re Roamer Linen Supply, Inc., 30 B.R. 932, 935 (Bkrtcy.S.D.N.Y.1983), to the effect that it is improper to elevate legal fees to postpetition status.) As to any property which is already the subject of liens, it is patent that the superpriority lien sought cannot be granted. See In re Flagstaff Foodservice Corp., 739 F.2d 73, 75, 76 (2d Cir.1984)."

16. See note, 15, supra.

17. In chapter 11 cases, the conversance of the court with matters affecting administration of the case, the timing of hearings, the transmission of notice and the like oftentimes require that ex parte conferences be held over noncontroversial and technical matters. But an ex parte conference initiated by counsel having a deep personal interest in the matter having been adjudicated was a signal impropriety in respect of the request for the superpriority lien of counsel.

closure statement proved to be an idle one, for it was submitted to the court on or about July 31, 1985, in susstantial compliance with the court's prior order.

On a prior occasion, the debtors requested leave of this court to incur credit in the form of a $100,000 loan from an insider. It was then proposed that the lending insider be granted a security interest in the stock of two solvent subsidiary corporations which was said to have a cumulative value of $2 million. This court then denied the request of the debtors in a written order filed November 9, 1984, making the following observations in doing so:

"There can be little dissent from the basic proposition of equality in the positions of those who contribute value to enable the actual and necessary expenses of the debtors' operations. But, in this context, an insider's money is no greener than that money or value which is contributed by others to operations of the debtors. And the evidence before the court shows without contradiction that others who are or may be entitled to payment as expenses of administration remain unpaid and that it is not proposed to grant them any security interest in any property of the debtors. According to the testimony of the debtors' officer, Mr. Mason, in the hearing of November 8, 1984, these unpaid bills currently amount to $144,000.00. They crucially include the work done by consulting engineers which the debtors must represent to the court constitutes an actual, necessary expense of administration. No basis is presented on which the court might reasonably predicate a conclusion that these contributions of value are less worthy than those which are now proposed to be made by an insider. Yet, it is now suggested that an insider should have a greater and more secure claim against the estate than other creditors of the same classification. But the fact that one is an insider does not, without more, give a creditor additional rights. In fact, it is sometimes held to diminish his status in making claims against the estate. Cf. section 510(c) of the Bankruptcy Code. Nor can it be said that the fact that the estate sorely needs the money and the insider will not grant it without being granted greater concessions than other similarly-situated creditors is sufficient reason in law or equity to grant the insider the edge which is sought over other creditors. In *Matter of Isis Foods, Inc.*, 37 B.R. 334, 337 (W.D.Mo.1984), the distinguished district judge, Joseph E. Stevens, Jr., held that '[t]o accept such a contention would permit those creditors most essential to the debtor's continued operation to plunder the estate and thereby to reduce greatly the likelihood of successful rehabilitation.' *The preferable course is for the insider to exhibit the same faith in an ultimately successful reorganization as the unpaid creditors of like class or type are now involuntarily required to exhibit ...*" (Emphasis added.)

Yet, the plans of reorganization which are currently before the court leave it open in many respects for the managing insiders and their counsel, without supervision of the court, to determine what amounts shall be subtracted from operating revenues for working expenses, including payments to themselves, before any payments are made to other creditors.[18] It is also to be noted that the entity which will actively manage the debtor corporations will be kept outside the jurisdiction of the bankruptcy court even as it may exercise considerable discretion in determining how monies are handled and either paid or not paid to creditors.

18. Further, according to the testimony of Joseph R. Bishop in the confirmation hearing of November 27, 1985, the court will not be permitted, subsequent to confirmation, to have any power to alter the salaries and compensation of the officers and directors. "We would require that we have the power of a corporation," according to his testimony. And there is no assurance that the court could control attorney's fees, especially in view of the manifest past reluctance even to disclose the taking of such fees to the court. And the managing entities would have unregulated power to withhold from creditors capital, in an unlimited amount, as working capital necessary for the continuation of operations.

Furthermore, the jurisdiction of this bankruptcy court is expressly limited and is to give way, six months after the date of confirmation, to the jurisdiction of the Bankruptcy Court for the Northern District of Texas.

### Conclusions of Law

Based on the foregoing material facts, the court has determined to deny confirmation on the grounds of (1) infeasibility of the plan within the meaning of § 1129(a)(11) of the Bankruptcy Code and (2) absence of good faith and of compliance with the provisions of chapter 11 as required by §§ 1129(a)(2), (3) of the Bankruptcy Code. There are other potential grounds for decision,[19] but because of time considerations, this should well restrict itself to the grounds which are most compelling.

### Infeasibility

■ Section 1129(a)(11) of the Bankruptcy Code defines feasibility, for the purposes of chapter 11 confirmation as the absence of a likelihood that "[c]onfirmation ... is ... to be followed by liquidation, or the need for further financial operation." The evidence which has been adduced in support of confirmation on this issue is to the effect that, although the sum of $9 million in outside financing is necessary to startup of the plants and the commencement of operations, there is no provable likelihood that it will be available in the foreseeable future. As observed above, the evidence which has been offered by the debtors on this issue only shows that, *if there are conditions which are satisfied* (and there is really no showing as to when they will be satisfied) the money in a sum of approximately $9 million will be available. With respect to the creditor who will furnish approximately half of that amount,

the testimony only shows that, if the preconditions of the commitment are in fact ever resolved, that resolution will take place within the 90 days next following the date of the confirmation hearing, November 27, 1985. As to the likelihood that resolution will take place within the 90 day period, the evidence is insufficient to demonstrate that it is, in the terms of the statute, "not likely [for reorganization under the proposed plan] to be followed by liquidation, or the need for further financial reorganizations, of the debtor." [20] And there is no credible showing, with respect to the contingencies contained in the other "commitments" that the monies will actually be made available in the near future.

It would have seemed preferable for determination of the issue of confirmation to have awaited the time when these monies were either available or likely to be available. But counsel for the debtors, in presenting their case for confirmation on November 27, 1985, have insisted that time is of the essence and that the issue of confirmation *vel non* must be shortly ruled and there is no time to wait to determine the likelihood that the financing will exist. Further, the debtors' contention has long been that the necessary precondition imposed by each and every potential lender is that a confirmed plan be in effect before the final decision of whether to commit the funds can be made.

But the confirmation of a plan in cases such as those at bar, in which there are to be issuances of stock in payment of indebtednesses under the plan, 55% of which are to go to insiders, places a special burden on a bankruptcy court to ascertain the soundness of the plan being confirmed. To adjudge the plan confirmed before it can truly be said to be reasonably likely that the

---

**19.** It can, with some general assurance, be noted that the written "objections to plans of reorganization" filed by Kidston Engineering Company, Redd & Associates Engineering, Inc., and Bloomfield Construction on October 31, 1985, have merit in almost every respect.

**20.** It must be said that a "commitment" made by Cyprus Trading, Inc., to fund $2,000 purports to

be effective when court orders of approval are obtained. But the "commitment" leaves it in the discretion of that potential lender as to when the orders necessary to trigger the duty to make the money available have been entered. Other so-called "commitments" surround their offers with this and other preconditions which have not demonstrably been satisfied.

financial infusions necessary to success of the plan will be made may well mislead potential purchasers of the stock. The patina of court confirmation may seem to such potential purchasers of the debtors' stock to indicate the operability of the plants which will provide the revenues essential to the plan, when the evidence in this case justifies no such finding. According to the evidence before the court, it is as likely that the financial infusions will never be made as it is that they will be made in the foreseeable future. And, when there is not one, but several, investors who are imposing conditions precedent to their actually committing the monies, the mere conclusionary contentions of the debtors that the monies will soon be available and that the conditions in the commitment will soon evaporate is not a sufficient basis on which to predicate confirmation of a plan. The proposal of counsel for the debtors that the court should grant confirmation and then hope against hope that the financing actually materializes is unfair to the court and to persons who may do business with the debtor corporations.

This, further, has always been a proceeding in which the proponents of the plans of reorganization have insisted that the court and creditors have more faith in the potential success of their endeavors than they themselves have evinced. As pointed out in the above findings of fact, their insecurity has repeatedly been manifested by their efforts to gain for themselves a stranglehold on all of the property of the estate.

*Absence of Good Faith and of Compliance with provisions of chapter 11 of the Bankruptcy Code*

■ Section 1129(a)(2) of the Bankruptcy Code provides that the "proponent of the plan [must] compl[y] with the applicable provisions of this chapter" and the following subsection, (a)(3), provides that "[t]he plan [must] ha[ve] been proposed in good faith and not by any means forbidden by law." The "good faith" provision has been interpreted as requiring that "the debtor

must accept the restrictions imposed by the Code." 5 Collier on Bankruptcy para. 1129.02, p. 1129–14 (1985). As has been observed above in the findings of relevant fact, the proponents of the plan in this case have not regarded themselves as bound by the restrictions of the Code. They have refused to obey the court's orders to pay administrative expenses to persons whom they themselves procured to perform certain tasks. They promised to pay them, only then to force them to go to a hearing in their attempt to realize on their promises. Orders of the court for payment were issued in accordance with well-established precedents in this district. Even then, the proponents have refused to pay them in direct contravention of the court's orders. Counsel for the proponents—who propose to remain as counsel for the debtor organizations subsequent to confirmation— were paid a "retainer" of $50,000 which they not only failed to disclose to the court, but in fact denied having taken it until May 31, 1985. Once this fact was discovered, counsel for the debtors shortly mounted a claim for some $300,000 in attorney's fees and requested that the court, without notice and a hearing, grant them a security interest in all the property of the estate to satisfy this as-yet unallowed claim. They have sought to have the court issue unconscionable orders in other respects, designed to dispense with the claims of creditors with little or no opportunity to be heard.[21] In other contexts, the bankruptcy court would be greatly reluctant to penalize those who may rely upon the plan for future sustenance because of the misconduct of the proponents of the plan. But it must be pointed out that, if the proposed plan of reorganization is to serve the interests of the creditors in this case, much depends upon the character and good conduct of those who will remain on the payroll as insiders and who will otherwise have a voice in determining how operations will be conducted and how revenues therefrom will be distributed. The latitude and freedom from judicial supervision which would be

---

21. See, e.g., note 12, *supra.*

accorded to the debtors' counsel and its executives under the terms of the plan clearly require, for the good of the creditors, some reasonable expectation that they will handle the revenues of the ethanol plant in a manner which would be at once reliable, trustworthy and fair to all the creditors. But their past performance, according to the facts which have been found above, demonstrates no such likelihood. Counsel for the debtors have, in fact, pointedly evaded the court's inquiry as to whether their attorney's fees would be considered subject to the governance of the court during the post-confirmation period.[22] And, even if they should concede this rather problematic point, there can be little, if any, reasonable expectation of proper, full and frank disclosure of funds taken as attorney's fees or salaries. The creditors of every category would be at the mercy of those who, in the past, have not shown themselves at all disposed to deal evenhandedly and equitably with them.

It seems to be the position of the proponents of the plan, whose disregard for the directives of the court and for the plights of administrative claimants has been made quite manifest, that the great majority of creditors, with eyes wide open, have voted in favor of confirmation of the plan of reorganization. Even those who have, at the outset, been the most vigorous and vociferous opponents of the plan, they observe, have now come around to accept the reality that the plans proposed in these cases—while perhaps not the best imaginable plans under the circumstances—are nevertheless better than the alternative now chosen by the court of non-confirmation. For, whatever the low degree of likelihood of payment of the creditors under the plan, it is certain that they would receive nothing in straight liquidation. In response to this argument, it must first be said that the mechanics' and materialmens' lienholders are not among the assenting group and that it can hardly be said that they are offered to be treated fairly and equitably under the terms of the proposed plans.

But the bankruptcy court would have the obligation, in cases such as those at bar, to deny confirmation even if there were no dissent from any of the creditors. For, otherwise, the disservice to the general public in making a wholly unproven operation seem viable and issues of stock based thereon seem marketable is simply too great. No bankruptcy court should permit itself to be used, on evidence such as has been presented and is contained in the files and records in this case, to create such a mirage as may hold the potential for harm to the unsuspecting. The current, tragic desperation of the creditors of these debtor corporations to be given some prospect, however faint, of recovery some of their losses cannot be permitted by this court to provide a basis for recreating virtually the same deceptive set of circumstances out of which that tragic desperation was originally borne.

It is therefore

ORDERED that confirmation of the respective plans of reorganization be, and it is hereby, in each case denied.