The FIRST BANK OF
WHITING, Appellant,

v.

KHAM & NATE'S SHOES, NO. 2,
INC., Appellee.

No. 88 C 10283.

United States District Court,
N.D. Illinois, E.D.

Aug. 17, 1989.

See also, Bkrtcy., 97 B.R. 420.

Robert E. Stochel, John M. O'Crobinak, P.C., Crown Point, Ind., for appellant.

JoAnn M. Hornak, Lord, Bissell & Brook, Chicago, Ill., for appellee.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Appellant First Bank of Whiting (the "Bank") appeals from the order of the United States Bankruptcy Judge David H. Coar dated October 20, 1988. Judge Coar's order subordinated the Bank's claim against the estate of appellee Kham & Nate's Shoes, No. 2, Inc. (the "Debtor") pursuant to the principal of equitable subordination; transferred the Bank's lien to the bankruptcy estate pursuant to 11 U.S.C. § 510(c)(2); and confirmed the Debtor's plan of reorganization. For the following reasons, the decision of the bankruptcy court is affirmed.

## FACTS

■ When a district court reviews a decision of the bankruptcy court, the district court must accept the bankruptcy court's findings of fact unless they are clearly erroneous. *In re Excalibur Automobile Corporation*, 859 F.2d 454, 457 n. 3 (7th Cir.1988); *In re Kimzey*, 761 F.2d 421, 423 (7th Cir.1985); *Matter of Evanston Motor Co., Inc.*, 735 F.2d 1029, 1031 (7th Cir. 1984); Bankruptcy Rule 8013. The party who seeks reversal of the findings of the bankruptcy court has the burden of showing that the findings were clearly erroneous and not merely that the bankruptcy court could have reached another conclusion. *In re Soucek*, 50 B.R. 753, 755 (Bankr.N.D.Ill.1985). This court may disturb the findings of the bankruptcy court only if it is " 'left with the definite and firm conviction that a mistake has been committed.' " *Matter of Muller*, 851 F.2d 916, 920 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1645, 104 L.Ed.2d 160 (1989), quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

The Debtor operates a retail shoe business in Chicago, Illinois. Khamolaw Beard, Jr. and Nathanial Parker own equity interests in the Debtor corporation. In the fall of 1983, Mr. Beard and Mr. Parker met with Donald O. Cassaday, the Bank's Senior Vice–President, to negotiate and obtain financing to ease the Debtor's occasional shortages of working capital. These discussions resulted in the Bank issuing certain unsecured letters of credit on behalf of the Debtor.

Thereafter, in December, 1983, the Debtor met with Mr. Cassaday to discuss additional credit. As a result of these discussions, the Bank prepared and sent to the Debtor a commitment letter dated January 4, 1984 in which the Bank agreed to lend the Debtor up to $300,000.00 through a line of credit as an interim loan. The parties apparently understood that the ultimate plan was to reorganize the Debtor with the proceeds of $1.2 million guaranteed loan through the Small Business Administration.

The Bank's agreement to extend credit to the Debtor was not unconditional. The agreement required the Debtor to file for relief under Chapter 11 of the Bankruptcy Code (the "Code") and to grant the Bank a "superpriority" lien on essentially all of the Debtor's post-petition assets pursuant to Section 364(c)(1) of the Code, 11 U.S.C. § 364(c)(1). Accordingly, the Debtor filed a Chapter 11 petition on January 11, 1984. A few days later, the debtor filed an Applica-

tion to Borrow Money and Grant Security Interest with the bankruptcy court in order to obtain approval for the $300,000.00 line of credit. On January 29, 1984 the bankruptcy court (per Toles, J.) entered an order (the "Financing Order") approving the line of credit and granting the Bank's "superpriority" lien.

On February 29, 1984, at the direction of the Bank's Board of Loan and Investment Committee (the "BLIC"), Mr. Cassaday notified the Debtor in writing that the Bank intended to terminate the line of credit with five days' notice. Although the written notice which the Debtor received did not explain the reasons for the termination, Michael Schrage, the Bank's President, informed the Debtor in April, 1984 that "he did not understand why the Debtor had come to Indiana for financing, that the Bank did not want to do business with the Debtor, and that the Debtor should go back to its own neighborhood to obtain financing." (Order at 6).[1] In addition, Mr. Schrage suggested at his deposition that the Bank terminated the Debtor's line of credit because Mr. Schrage did not get along with Mr. Cassaday.[2]

Because the Debtor was unable to arrange alternative financing after the Bank terminated the line of credit, the Debtor sustained substantial business losses. Inventory costs increased because the Debtor was required to make all its purchases COD, forfeit inventory discounts, and purchase inventory of inferior quality from new suppliers at higher prices. Correspondingly, sales revenues decreased because the Debtor was unable to maintain adequate quantities of high quality inventory. The Debtor also was forced to close branch locations and to cancel plans for opening a new store.

The Debtor has repaid a portion of its obligations to the Bank. Since 1984, the Debtor has repaid approximately $71,000.00 of the funds the Bank advanced to it, about half of which the Debtor repaid before the Bank terminated the line of credit. In addition, the Debtor made a $10,000.00 payment to the Bank in 1985 which the Debtor claimed constituted both an attempt to show its good faith and a tool for negotiating a reasonable interest rate on its remaining outstanding debt under the line of credit. The Bank accepted the $10,000.00 payment, but rejected the Debtor's proposed repayment plan.

The Debtor filed its initial plan of reorganization on May 28, 1985 and amended plans of reorganization on January 27, 1986 and March 23, 1988. In its Second Amended Plan of Reorganization, the Debtor for the first time requested the court to subordinate the Bank's claim to the interests of the other creditors on the grounds that the Bank had acted inequitably. On October 21, 1988 the bankruptcy court (per Coar, J.)[3] approved the Second Amended Plan of Reorganization. This appeal followed.

## DISCUSSION [4]

### A. *Equitable Subordination*

The Bank argues on appeal that Judge Coar erred in equitably subordinating the Bank's claim pursuant to Section 510(c) of the Code.[5] The doctrine of eq-

---

1. The testimony during the trial revealed that the BLIC directed Mr. Cassaday to terminate the line of credit because the BLIC did not like the nature of the credit to a Chapter 11 debtor, did not like the location of the Debtor's business, and did not think that the Bank should be doing business on the south side of Chicago.

2. The bankruptcy court found that the Bank failed to provide the Debtor with telephonic notice of the termination even though the Financing Order issued by the bankruptcy court required both written and telephonic notice before a party could terminate the agreement.

3. This case was assigned to Judge Coar in October, 1986.

4. This court reviews Judge Coar's conclusions of law *de novo*. *In re Excalibur Automobile Corporation*, 859 F.2d at 457 n. 3; *In re Kimzey*, 761 F.2d at 423.

5. Section 510(c) of the Bankruptcy Code provides:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

uitable subordination exists " 'to prevent the consummation of a course of conduct by [a] claimant which ... would be fraudulent or otherwise inequitable' by subordinating his claims to the ethically superior claims asserted by other creditors." *Matter of Mobile Steel Co.*, 563 F.2d 692, 699 (5th Cir.1977), quoting *Heiser v. Woodruff*, 327 U.S. 726, 733, 66 S.Ct. 853, 856, 90 L.Ed. 970 (1946). Courts generally agree that equitable subordination is an extraordinary remedy which should not be invoked lightly. *In re Claxton*, 76 B.R. 539, 546 (Bkrtcy.E.D.Va.1987); *Matter of Kenny*, 75 B.R. 515, 527 (Bkrtcy.E.D.Mich.1987); *In re Tinsley & Groom*, 49 B.R. 85, 90 (Bkrtcy.W.D.Ky.1984); *Matter of Teltronics Services, Inc.*, 29 B.R. 139, 168 (Bkrtcy. E.D.Ohio 1983).

■ Certain conditions must be satisfied before a bankruptcy court appropriately exercises its power of subordination. In *Matter of Mobile Steel Company, supra*, the Fifth Circuit described these conditions as follows:

1. The claimant must have engaged in some type of inequitable conduct.

2. The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and

> (2) order that any lien securing such a subordinated claim be transferred to the estate. 11 U.S.C. § 510(c).

**6.** In *K.M.C.*, the Sixth Circuit considered whether sufficient evidence supported the jury's conclusion that Irving Trust Co. ("Irving") breached its lending agreement to K.M.C. Under the lending agreement, Irving agreed to extend to K.M.C. a line of credit *not to exceed $3.5 million.* In exchange, K.M.C. granted Irving a security interest in its inventory and accounts receivable. The lending agreement required K.M.C. to deposit all of its receipts into a "blocked account" to which Irving had sole access. After K.M.C. drew $2.7 million under the agreement over a period of three years, K.M.C. sought an additional $800,000 advance. Irving refused without notice to advance K.M.C. the additional amount. K.M.C.'s subsequent inability to obtain additional financing resulted in the company's eventual collapse and a lawsuit against Irving for breach of the lending agreement. After trial before a federal magistrate, the jury returned a verdict against Irving for $7.5 million.

3. Equitable subordination of the claim must not be inconsistent with the provisions of the Code.

563 F.2d at 700.

### 1. *Inequitable Conduct*

■ In concluding that the Bank acted inequitably in terminating the Debtor's line of credit, the Bankruptcy Court applied a "good faith" standard to the Bank's conduct. The court noted that the Illinois version of the Uniform Commercial Code ("UCC") implies into every contract an obligation of good faith. *See* Ill.Ann.Stat. ch. 26, ¶ 1–203 (Smith–Hurd, 1981). The court then relied on *K.M.C., Inc. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir.1985), to reach its conclusion that the Bank's conduct fell below the standard of "good faith."[6] In so holding, the court noted that (1) the Bank was fully secured to the amount of credit it extended to the Debtor; (2) the Bank maintained absolute control over all further extensions of credit through its monitoring and approval process; and (3) the Financing Agreement and Financing Order provided the Bank with a Section 364(c)(1) lien on all the Debtor's post-petition assets for both pre-petition and post-petition obligations. The court therefore concluded that the Bank's conduct failed the "good faith" test because there existed no valid

On appeal, the Sixth Circuit affirmed. The court first noted that the jury instruction which held Irving up to a duty of good faith in exercising its discretion under the lending agreement was not a misstatement of the law. The court stated that the contract contained an inherent duty of good faith because the financing agreement and the "blocked account" mechanism left "K.M.C.'s continued existence entirely at the whim or mercy of Irving." *Id.* at 759. The court required Irving to meet the "good faith" standard of a reasonable loan officer exercising his or her discretion in the same or similar circumstances. Then, the court concluded that Irving's conduct fell below this standard because 1) Irving's extension of credit under the lending agreement was fully secured; 2) Irving failed to provide notice to K.M.C. before refusing to extend additional credit; and 3) no unusual events occurred in the relationship between Irving and K.M.C. immediately prior to Irving's refusal to extend the additional credit. *Id.*

business reason to terminate the line of credit.

The bankruptcy court erred in applying a "good faith" standard to the facts of this case. Generally, a claimant's conduct must amount to more than "lack of good faith" in order to warrant equitable subordination of his claim. *See generally Matter of Teltronics Services, Inc., supra* at 169. It is true that, when the claimant is an "insider," the objectant must only come forward with sufficient substantiations of misconduct to raise an inference of unfair dealing. *Id.* In such a case, the burden then shifts to the insider to prove the fairness of his transactions. *Id.* However, where the claimant is a non-insider, as in this case, the objectant must prove egregious misconduct with particularity. *Id.* "In such a case, it is insufficient for the objectant to establish sharp dealing; rather, he must prove that the claimant is guilty of gross misconduct tantamount to 'fraud, overreaching or spoliation to the detriment of others.'" *Id.*, quoting *In re W.T. Grant Co.*, 4 B.R. 53, 74–75 (Bkrtcy.S.D.N.Y. 1980). *Accord In re Pacific Express, Inc.*, 69 B.R. 112, 116 (9th Cir. BAP 1986); *In re Future Energy Corp.*, 83 B.R. 470, 483 (Bkrtcy.S.D.Ohio 1988); *In re Ess, Inc.*, 1987 U.S.Dist. LEXIS 13648, 26 (Bkrtcy.E. D.Cal.1987); *In re Ludwig Honold Mfg. Co.*, 46 B.R. 125, 128 (Bkrtcy.E.D.Pa.1985). Equitable subordination was only appropriate in this case if the Bank engaged in "fraud, overreaching or spoliation."

Although the bankruptcy court erred by measuring the fairness of the Bank's conduct against a standard of good faith, the court's findings support the conclusion that the Bank's actions constituted "gross misconduct." The bankruptcy court found that the Bank granted and then terminated the line of credit in order to obtain a senior interest in the Debtor's post-petition assets. (Order at 15, 16). The Bank held eight unsecured letters of credit on behalf of the Debtor prior to granting the Debtor a line of credit. In order to secure these letters of credit, the Bank agreed to the line of credit on the conditions that the Debtor file a Chapter 11 petition and grant the Bank a superpriority lien on all of its post-petition assets. The Bank encouraged the Debtor to withhold payments to its creditors, on the pretense of accumulating cash, so that the creditors would call on the Bank to honor its obligations under the letters of credit. (Tr. May 4, 1988 at 33). The Debtor subsequently used approximately $100,-000.00 of the proceeds from the line of credit to repay the letters of credit. (Tr. June 18, 1988 at 39–42). In this way, the bankruptcy court concluded, the Bank acquired a post-petition lien on the Debtor's previously unencumbered assets in order to repay a pre-petition, unsecured obligation.

The Bank terminated the line of credit less than six weeks after the Debtor filed its petition in bankruptcy. The bankruptcy court apparently found that, once the Bank had secured its pre-petition extensions of credit, the Bank had no further interest in extending credit to the Debtor under the line of credit. The Bank therefore terminated the Debtor's ability to draw from the line of credit, even though the line was fully secured, the Debtor was making timely payments under the terms of the agreement, and the Bank knew that the Debtor's future financial health depended on obtaining additional working capital from the Bank.

The Bank contends that the bankruptcy court's version of the facts is not supported by the record and is therefore clearly erroneous. The Bank first contends that the court erred in finding that the Debtor would not have filed bankruptcy "but for the strong urging from the Bank." (Order at 18). Contrary to the Bank's insistence, the record supports this conclusion. The Debtor's attorney, Richard Golding, whom the Bank recommended to assist the Debtor in its reorganization, testified in his deposition that the Bank believed its relationship with the Debtor would best be served if the Bank had the protections afforded by the Code. (Golding Dep. (Bank's Ex. 23) at 8–9). In addition, the individuals who own the debtor corporation each testified at the trial that they would not have filed under Chapter 11 if the Bank had not conditioned the line of credit on the filing of a bankruptcy petition. (Tr. May 4, 1989 at 32; Tr.

May 5, 1989 at 80–81). The bankruptcy court's conclusion that the Bank provided the primary impetus for the Debtor's Chapter 11 petition is not clearly erroneous.

The Bank next argues that, contrary to the findings of the bankruptcy court, it justifiably terminated the Debtor's line of credit because Mr. Cassaday violated the Bank's lending policy by extending credit to a debtor whose business was located outside the permissible geographical area.[7] (Tr. May 5, 1989 at 26). However, the bankruptcy court was not wrong to reject the Bank's reasons for terminating the line of credit. Mr. Cassaday's testimony establishes that he wrote the Bank's lending policy and that it did not limit the permissible geographical location of loans. (Tr. May 5, 1989 at 40). In addition, the Bank had maintained an ongoing lending relationship with the Debtor since 1981 and had never raised the issue of the Debtor's location prior to 1984. The bankruptcy court's rejection of the Bank's reasons for terminating the line of credit was not clearly erroneous.

The Bank next contends that its conduct could not have amounted to egregious misconduct because it complied with the termination provision in the Financing Agreement, which the bankruptcy court's Financing Order approved, when it terminated the line of credit. The court finds this line of reasoning unpersuasive. The Bank's misconduct was not limited to the manner in which it terminated the line of credit. The bankruptcy court found that the Bank acted inequitably by agreeing to extend a line of credit to the Debtor on the pretense of assisting the Debtor's reorganization when its true motivation was to secure its previously unsecured obligations. The scope of the Bank's scheme obviously exceeded the bounds of the Financing Order. Consequently, the Bank cannot escape the conclusion that its conduct was inequitable by claiming that it complied with court-sanctioned procedures when it terminated the Debtor's line of credit.

In sum, the bankruptcy court's conclusion that the Bank acted inequitably under the first prong of the *Mobile Steel* analysis is not clearly erroneous. The Bank's actions were sufficiently egregious to amount to gross misconduct under the prevailing standard for non-insider creditors.

### 2. *Injury to Other Creditors*

The bankruptcy court also correctly concluded that the Bank's misconduct injured other creditors. The court noted that the Bank achieved a priority in distribution of the Debtor's assets which was superior to all the general unsecured creditors that existed before the Debtor filed its petition under Chapter 11. The court found that, unless the Bank's lien was subordinated, the Debtor would be liquidated and unsecured creditors would receive no distribution on their claims. The Bank's conduct in achieving this superpriority lien necessarily disadvantaged these creditors. The court further found that the business losses which the Debtor incurred as a result of losing the line of credit necessarily harmed the creditors, especially because the Bank's counsel led the creditors to believe that the line of credit was available to fund the Debtor's plan of reorganization. (Order at 4, 5). The bankruptcy court did not err by concluding that the Banks' misconduct harmed the interests of other creditors.

### 3. *Consistency with Provisions of the Bankruptcy Code*

Finally, the bankruptcy court correctly concluded that subordinating the Bank's claim would not conflict with provisions of the Code. The Bank was aware of the Debtor's condition and recognized the harm to the Debtor's financial health which would result from terminating the line of credit. In addition, much of the Bank's misconduct occurred after the Debtor filed its Chapter 11 petition. The Bank's disregard for the interests of other creditors and the strength of the Debtor's reorganization justified equitable subordination.

The bankruptcy court's decision to equitably subordinate the Bank's claim was not clearly erroneous. Although the bankrupt-

---

7. The Bank's loan policy is not a part of the    record currently before the court.

cy court erred by applying a "good faith" standard to the Bank's conduct in order to determine whether the Bank acted inequitably under the *Mobile Steel* analysis, the Bank's conduct nevertheless was sufficiently egregious to constitute "gross misconduct" under the proper standard of conduct. Further, the bankruptcy court did not err in concluding either that the Bank's misconduct injured other creditors or that subordinating the Bank's claim would not be inconsistent with the Code. The Bank's claim therefore was properly subordinated to the claims of the general creditors.

### B. *Motion to Vacate Financing Order*

■ The second issue the Bank presents on this appeal from the October 20, 1988 Order of the bankruptcy court concerns the court's decision to vacate the Financing Order. The bankruptcy court vacated the Financing Order pursuant to the Debtor's Rule 60(b) motion to vacate. The Bank contends that Judge Coar did not have the authority to vacate an order which Judge Toles entered four years previously pursuant to the agreement of the parties.

Judge Coar was within his authority when he vacated the financing order. The Debtor's application to the bankruptcy court for leave to borrow money under the financing agreement contemplated the possibility that a court might subsequently modify, vacate or stay the Financing Order. (See Application to Borrow Money and Grant Security Interest, p. 9). The Application provided that any such action would not affect the validity of any debt the Bank extended to the Debtor prior to the modification or alteration of the order. For the Bank to claim on appeal that the Application memorialized the agreement of the parties (and in fact constitutes a consent decree) and at the same time to assert that the bankruptcy court was without authority to vacate its previous order ignores the obvious contemplation of the parties in submitting the Application.

Furthermore, the bankruptcy court was clearly within its authority in vacating the financing order pursuant to Rule 60(b)(6). Rule 60(b)(6) permits a judge to relieve a party from a court order if the court deems such action justified. *See* Fed.R.Civ.P. 60(b)(6). The bankruptcy court's opinion states that the Financing Order through which the Bank obtained its claim on the Debtor's estate "is vacated in the interest of equity and fair play." (Order at 19). In light of its previous conclusion that the Bank acted inequitably in issuing the line of credit to the Debtor and then terminating it for no valid reason, the court was not in error for vacating the Financing Order.

The bankruptcy court's decision to vacate the Financing Order was not erroneous. Consequently, the Bank's objection to the October 20, 1988 Order does not warrant reversal.

### C. *The Plan of Reorganization*

The Bank presents three objections to the bankruptcy court's decision to confirm the Debtor's Second Amended Plan of Reorganization: (1) the circumstances of this case do not satisfy the requirements of the new capital contribution exception to the absolute priority rule; (2) the bankruptcy court erred in concluding that the proposed plan was feasible within the meaning of Section 1129(a)(11) of the Code; and (3) the court erred in finding that the Debtor filed its plan in good faith.

#### 1. *Absolute Priority Rule*

■ The Code permits a bankruptcy court to confirm a Plan of Reorganization only if the plan satisfies the requirements of Section 1129(a)(1) through (a)(13). Judge Coar concluded that the Debtor's Second Amended Plan of Reorganization met the applicable requirements of this section except for Subsection (a)(8). Subsection (a)(8) requires a court to find that "[w]ith respect to each class of claims or interests, (A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8). Because the bankruptcy court found that the Bank neither accepted the Debtor's proposed plan nor stood unimpaired under the plan, the plan did not satisfy Section 1129(a)(8).

Judge Coar confirmed the plan notwithstanding the fact that the plan did not meet the requirements of Section 1129(a)(8). The judge relied on the "cram down" provision in Section 1129(b)(1). Section 1129(b)(1) states, in pertinent part:

[I]f all the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1). The term "cram down" refers to the process by which a bankruptcy court confirms a plan even though a class of creditors does not accept its terms. *Matter of Stegall*, 865 F.2d 140, 141 (7th Cir.1989).

Section 1129(b)(1) permits a bankruptcy court to resort to "cram down" in confirming a Plan only when the plan is "fair and equitable" to the holders of impaired claims. In order to be "fair and equitable" under Subsection (b)(1), the Plan must also satisfy Section 1129(b)(2)(B)(ii). This provision requires that the holders of claims which are junior to the class of dissenting creditors (such as holders of equity interests in a debtor corporation) receive no interest in the debtor's property unless and until all senior classes receive full compensation. Section 1129(b)(2)(B)(ii) is commonly referred to as the "absolute priority rule." *In re Potter Material Service, Inc.*, 781 F.2d 99, 101 (7th Cir.1986).

Judge Coar relied upon a well-recognized exception to the absolute priority rule when he confirmed the Debtor's Second Amended Plan of Reorganization. The exception upon which Judge Coar relied permits an equity holder to retain an interest in the debtor estate if he or she invests new capital into the estate. *See Potter Material Service, Inc.*, 781 F.2d at 101. *Cf. Stegall*, 865 F.2d at 141–42. Thus, if the new capital investment 1) represents a substantial contribution, and 2) equals or exceeds the value of the retained interest in the corporation, then the equity holder may participate in the reorganization to the extent of the new investment. *In re Potter Material Service, Inc.*, 781 F.2d at 101; *In re Future Energy Corp.*, 83 B.R. at 499; *In re Olson*, 80 B.R. 935, 937 (Bkrtcy.C.D.Ill. 1987); *In re Sawmill Hydraulics, Inc.*, 72 B.R. 454, 456 (Bkrtcy.C.D.Ill.1987).

The bankruptcy court found that the Plan required Mr. Parker and Mr. Beard to contribute new capital to the Debtor corporation in the form of "personal guarantees and possibly mortgages on their homes." (Order at 25). The court noted that these obligations would "provide guarantees and collateral for substantial loans, the proceeds of which will fund the Plan and provide working capital for the Debtor." *Id.* Although the court did not assess the value of this "capital investment," the court concluded that it was substantial because the guarantees and mortgages benefit the debtor and constitute risks to Mr. Parker and Mr. Beard. Moreover, the court concluded that the shareholders' "personal contributions greatly outweigh the salaries and any psychic pleasures the equity holders will receive from operating this business in the reasonably foreseeable future." (Order at 28).

The Bank contends that the bankruptcy court erred in two respects when it concluded that the Plan meets the "new capital exception" to the absolute priority rule. First, the Bank argues that the interest retained by Mr. Parker and Mr. Beard under the Plan was substantially more valuable than the bankruptcy court found it to be. Second, the Bank insists that the evidence did not support the conclusion that the economic risk to the debtor exceeded the value of the debtor's retained interest.

The bankruptcy court's conclusion that Mr. Parker's and Mr. Beard's retained interest in the Debtor corporation was only of minimal value was not clearly erroneous. Contrary to the Bank's insistence, the Debtor produced enough evidence at the trial for the court to conclude that the Debtor had a negative going concern value. Larry J. Wolfe, C.P.A. testified during the

trial that the value of the Debtor's business as a going concern was negative $140,-000.00. (Tr. May 13, 1988 at 62). Mr. Wolfe projected the Debtor's future income for the years 1989, 1990 and 1991, taking into account the Debtor's outstanding indebtedness to the Bank and its other creditors. (*Id.* at 66, 68). He then valued the corporation by discounting the projected earnings of the company at the rate of return Mr. Wolfe believed a prudent investor would demand for an investment in a corporation such as the Debtor, taking into account the nature of the business, the risk involved, and the stability of the company's earnings. *Id.* at 69–70. Bankruptcy courts have almost universally applied this formula when calculating the value of a shareholder's retained interest. *In re Future Energy Corp.*, 83 B.R. at 500, and cases cited.

The Bank further argues that the bankruptcy court erred by concluding that the intangible value of the interest retained by Mr. Parker and Mr. Beard was insignificant. The court evaluated the value of the shareholders' intangible interest according to the standard outlined in *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). In *Ahlers*, the Supreme court found that

> [e]ven where debts far exceed the current value of assets, a debtor who retains the equity interest retains 'property.' Whether the value is 'present or prospective, for dividends or only for purposes of control' a retained equity interest is a property interest to 'which the creditors [are] entitled ... before the stockholders [can] retain it for any purpose whatever.'

*Id.* 108 S.Ct. at 969, quoting *Northern Pacific R. Co. v. Boyd*, 228 U.S. 482, 508, 33 S.Ct. 554, 561, 57 L.Ed. 931 (1913). The bankruptcy court, applying this standard, concluded:

> So there is some value to be attributed to the interest retained by the Debtor's equity holders. The record is clear that the future profitability of this enterprise is speculative. The only real quantifiable interest is the salaries the equity holders will be entitled to for their labor. As the Court held in *Ahlers, supra,* there may

be some value in controlling the business, and the freedom to hire oneself and to be one's own boss may also be valued. But it is difficult to place monetary value on any pleasure derived from enduring a Chapter 11 case or the joy of trying to rescue a distressed business.

(Order at 27–28). The bankruptcy court, who listened to all of the testimony and was in the best position to judge the parties' attitudes at the trial, was entitled to conclude that the shareholders' intangible retained interest in owning and operating Kham & Nate's was insignificant.

Nor did the bankruptcy court err in concluding that the new capital provided to the Debtor by Mr. Parker and Mr. Beard exceeded the value of their retained interest. The personal guarantees and mortgages that Mr. Beard and Mr. Parker provided to secure the loan from Beverly Bank exposed these shareholders to substantial economic risk. Richard J. Boudi, an Assistant Vice President at the Beverly Bank, testified that the Beverly Bank approved the Debtor's loan request for $435,000.00. (Tr. May 4, 1988 at 140). Therefore, although not concrete, the amount of the Beverly Bank loan was sufficiently definite to allow the bankruptcy court to ascertain the approximate degree of risk to Mr. Parker and Mr. Beard.

Further, the Beverly Bank loan is to be secured by personal guarantees as well as mortgages on property owned by the Debtor and by Mr. Parker and Mr. Beard personally. (Tr. May 4, 1989 at 148, 152). The likelihood that Mr. Parker and Mr. Beard will experience personal economic losses as a result of these obligations is not insignificant; the Debtor has been embroiled in a Chapter 11 bankruptcy proceeding since January, 1984 and, as previously discussed, has been found to have a negative going concern value. The bankruptcy court was entitled to conclude that the personal contributions of Mr. Parker and Mr. Beard subject them each to substantial economic risk. *See In re Potter Material Service, Inc.,* 781 F.2d at 102–03; *In re Sawmill*

*Hydraulics, Inc.,* 72 B.R. at 457. *Cf. In re Future Energy Corp.,* 83 B.R. at 498.[8]

The record before this court amply supports the bankruptcy court's conclusion that the interest in the Debtor retained by Mr. Parker and Mr. Beard as a result of the Plan of Reorganization was far less than the economic risk they assumed by providing personal guarantees and mortgaging their homes in order to obtain the Beverly Bank loan. The bankruptcy court therefore did not err by confirming the Debtor's Plan of Reorganization notwithstanding the absolute priority rule.

### 2. Feasibility

■ The Bank next objects that the bankruptcy court erred by finding that the Plan satisfied the feasibility standard of Section 1129(a)(11) of the Code. Section 1129(a)(11) permits confirmation of a plan only if "[c]onfirmation ... is not likely to be followed by liquidation, or the need for further financial reorganization." The bankruptcy court found that the Debtor's Plan was feasible because the Plan would generate sufficient loan proceeds "to render the reorganized Debtor a viable entity." (Order at 23). The court further found that the Beverly Bank loan would leave the Debtor's inventory available as collateral for a working capital loan. *Id.* The court also noted that other lending institutions had expressed willingness to provide financing to the Debtor. *Id.*

The Bank argues that the bankruptcy court erred because the Beverly Bank had not made a firm commitment to fund the Plan with a $435,000.00 loan. As the bankruptcy court recognized, the Beverly Bank conditioned its agreement to lend the necessary funds to the Debtor upon resolution of

the Debtor's dispute with the Bank. (Order at 23). The Bank contends that the financing was also conditioned upon substantiation of the values placed by the Debtor on its real estate and the guaranteeing of the loan by the Small Business Administration. Citing *Matter of Midwestern Companies, Inc.,* 55 B.R. 856 (Bkrtcy. W.D.Mo.1985), the Bank contends that the contingent nature of the proposed financing was fatal to the feasibility of the Plan.

In *Midwestern Companies,* three debtor corporations claimed ownership rights in certain ethanol plants which were either not being operated or were not yet operable. 55 B.R. at 856. The proposed plan of reorganization stated that $9 million in outside financing was necessary in order to begin operations at these plants. *Id.* Evidence at the trial indicated that several lending institutions had agreed to fund the plan, but each of these agreements were subject to a number of conditions, including the resolution of certain litigation against the debtors. *Id.* at 857.

The bankruptcy court found that the proposed plan was not feasible. The court noted that no evidence had been adduced at the trial to show that the conditions were likely to be satisfied and the monies made available in the near future. 55 B.R. at 862. Especially relevant to the court's conclusion was the fact that the plan required the debtors to issue stock to outside investors: "To adjudge the plan confirmed before it can truly be said to be reasonably likely that the financial infusions necessary to success of the plan will be made may well mislead potential purchasers of stock." *Id.* at 863. Also relevant to the court was the fact that the success of the plan depended upon not one, but several investors

---

8. The Bank argues that the Debtor failed to produce evidence of Mr. Parker's and Mr. Beard's financial condition, and that therefore the bankruptcy court could not possibly have been able to ascertain the degree of economic risk assumed by these shareholders. However, this evidence is not necessary to the bankruptcy court's conclusion that the shareholders' retained interest is less than their contribution to the reorganization. In *Potter,* the Seventh Circuit affirmed a bankruptcy court's conclusion that a personal guarantee was an economic risk

of "indeterminate value." *Potter,* 781 F.2d at 103. The bankruptcy court was not obligated to quantify the precise extent of the risk to Mr. Parker and Mr. Beard.

The Bank also argues that the personal guarantees and mortgages provided by Mr. Parker and Mr. Beard were not risky because the shareholders' assets were already mortgaged to the Debtor's creditors. Because the Bank does not support this claim with any evidence in the record, however, this court will not consider this argument.

who imposed conditions precedent to their actually committing the funds. *Id.* The court therefore concluded that the contingent nature of the necessary financing rendered the proposed plan infeasible.

The conclusion of the bankruptcy court in *Midwestern Companies* does not dictate the conclusion that Judge Coar erred in finding that the Plan proposed by the Debtor in this case met the requirements of Section 1129(a)(11). First, this case does not involve the security of outside investors. Nor does the Plan depend upon contingent financing agreements from a number of different investors. The contingency in this case involves financing from only one lender. Moreover, unlike in *Midwestern Companies,* this Debtor is not required by the loan contingencies to resolve pending third-party litigation or other disputes outside the bankruptcy. Although the Bank refers to the duty of the Debtor to resolve its dispute with the Bank as "rather insurmountable," (Bank's Memo at 40), the bankruptcy court's ruling on the equitable subordination issue goes far to assist in this process. In addition, Mr. Boudi testified that he did not anticipate a problem in securing approval of the loan from the Small Business Administration. (Tr. May 4, 1989 at 142).

The Bank suggests that the Plan was infeasible according to the standards set forth in *In re Future Energy Corp., supra.* In that case, the bankruptcy court noted that in order to determine whether a proposed plan of reorganization meets the feasibility requirement, some courts consider several factors, including the earning power of the business, economic conditions, the ability of management, and the probability of the continuation of the same management. 83 B.R. at 503. The Bank argues that the Plan in this case is infeasible because the Debtor's future earning potential and the future economic conditions within which the Debtor operates are speculative.

This court is not persuaded that these factors render the Plan infeasible. Although the bankruptcy court found the Debtor's future profitability to be "speculative," (Order at 27), the court also noted that "the Debtor is a viable and growing business when it has sufficient working capital." (Order at 24). This finding is amply supported by the record: the retail stores operated by the Debtor prior to its difficulty with the rescinded line of credit were profitable the year prior to their closing, (Parker Dep. 101, 102), and the Debtor's sales improved when the Debtor had sufficient funds to purchase inventory. (Parker Dep. at 122–23). As recognized by the court in *In re Future Energy Corp.,* the Plan must offer a *reasonable* prospect of success—"success need not be guaranteed." 83 B.R. at 503, quoting *In re Monnier Brothers,* 755 F.2d 1336, 1341 (8th Cir.1985).[9]

The record clearly supports the bankruptcy court's conclusion that the Beverly Bank was "reasonably likely" to fund the Plan. *Midwestern Companies,* 55 B.R. at 862–63. Moreover, the Debtor's prospects for future profitability, although speculative, were reasonable. Confirmation of the Plan notwithstanding the conditions that Beverly Bank placed upon its agreement to finance the Plan and the future profitability of the Debtor's business therefore was not clearly erroneous.

3. *Good Faith*

Finally, the Bank objects to confirmation of the Plan on the grounds that the Debtor proposed the Plan in bad faith, contrary to the provisions of Section 1129(a)(3) of the Code.[10] According to Judge Coar's opinion, the Bank argued to the bankruptcy court that the Debtor acted in bad faith because it requested the court to equitably subor-

---

**9.** The Bank also notes that the Debtor's present management has been ineffective because the Debtor is currently requiring the assistance of the bankruptcy court. However, the Bank has not invited the court's attention to any evidence in the record which tends to show that Mr. Parker and Mr. Beard demonstrated ineffective management skills.

**10.** Section 1129(a)(3) requires that a plan may be confirmed only if "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).

dinate the Bank's claim. (Order at 20). The Bank's current objection is that the Debtor acted in bad faith by incurring certain post-petition obligations and failing to amend its disclosure statement.

This court finds no error in the bankruptcy court's conclusion that the Debtor's conduct met the standard of Section 1129(a)(3). The Bank's allegations of bad faith are not supported by citations to the bankruptcy record. The Debtor insists that the Bank relies solely on matters outside the record which were not presented to the bankruptcy court. Because the Bank's objection to the bankruptcy court's decision is not properly supported, this court has no basis from which to conclude that the decision was clearly erroneous.

After thoroughly reviewing the transcripts of the proceedings before the bankruptcy court and considering the Bank's objections to Judge Coar's findings and conclusions, this court concludes that the conclusions reached by the bankruptcy court were not clearly erroneous. Although the bankruptcy court evaluated the inequity of the Bank's conduct according to an improper standard, Judge Coar's ultimate findings supported the conclusion that the Bank's claim should be subordinated to the claims of the other creditors. Moreover, Judge Coar's decision to vacate the Financing Order in order to effectuate equitable subordination was not error. Finally, the court correctly concluded that the Debtor's Second Amended Plan of Reorganization satisfied the requirements of Section 1129(a) of the Code.

## CONCLUSION

For the reasons stated in this memorandum opinion and order, the decision of the bankruptcy court is AFFIRMED.