In re **WILDE HORSE ENTERPRISES, INC., a California corporation, etc.,** Debtor.

**Bankruptcy No. SB 90–04906 LR.**

United States Bankruptcy Court, C.D. California.

Dec. 23, 1991.

Naomi R. Bernstein, Ontario, Cal., for debtor.

N.L. Hanover, San Bernardino, Cal., Chapter 7 Trustee.

## MEMORANDUM OF DECISION DENYING ATTORNEY'S FEES TO DEBTOR'S ATTORNEY OF RECORD, NAOMI R. BERNSTEIN, ESQ.

LYNNE RIDDLE, Bankruptcy Judge.

The application of Debtor's counsel for payment of attorney's fees came on for hearing before the undersigned United States Bankruptcy Judge on October 9, 1991; Applicant Bernstein appeared on her on behalf. While Chapter 7 Trustee Norman L. Hanover and United States Trustee attorney Timothy J. Farris, Esq. appeared at the hearing, neither objected to the application. No other party appeared or filed written objections to the fee request. The matter was taken under submission to allow the Court time to review the entire record in this case.

### ISSUE

The issue raised is whether Attorney Bernstein is entitled to attorney's fees to be paid out of Debtor's estate.

## BRIEF CONCLUSION

Following a thorough review of the application, the file, audio tape recordings of prior hearings and the Debtor's interim and operating reports filed with the United States Trustee, the Court finds that counsel's misconduct in the case, i.e. her breach of her fiduciary duty to act in the best interests of the estate and her failure to act competently, is a sufficient ground to deny her application for compensation in its entirety, and on that basis the motion is denied. Moreover, Ms. Bernstein will be ordered to immediately disgorge and surrender to the Chapter 7 Trustee her prepetition retainer in the sum of $6,500.

## GENERAL BACKGROUND FACTS

Debtor filed a "face sheet" Chapter 11 petition on June 8, 1990. Additionally, on that day, Debtor filed a Summary of Debts and Property, executed under penalty of perjury, stating that Debtor's total debt was $28,909; all debt was reported as general unsecured debt. Regarding priority and secured debt, the Debtor stated "None".

In the same document, Debtor's assets were reported to have the total value of $151,000, as follows:

| | | |
|---|---|---|
| (1) cash | = | $ 1,500; |
| (2) deposits | = | 53,000; |
| (3) vehicles | = | None; |
| (4) office equipment, etc. | = | 1,000; |
| (5) machinery and equipment | = | 45,000; |
| (6) inventory | = | 40,000; |
| (7) accounts receivable | = | None; and |
| (8) unliquidated claims | = | 11,000. |

Twelve days later, on June 20, 1990, Debtor delivered to the Clerk the documents remaining to perfect its filing. The A Schedules showed the following debt: Priority = $ –0–; Secured = $199,000; General unsecured debt = $142,936.

Debtor's B Schedules contained a list of Debtor's property and its value, as follows:

| | | |
|---|---|---|
| (1) cash | = | $ –0–; |
| (2) deposits | = | 67,035; |
| (3) vehicles | = | 60,929; |
| (4) office equipment, etc. | = | 1,000; |
| (5) machinery and equipment | = | 45,000; |
| (6) inventory | = | 71,579; |
| (7) accounts receivable | = | 21,182; and |
| (8) unliquidated claims | = | 11,000. |

The value of Debtor's reported assets equaled $277,725.

The Court has never been informed as to why the information regarding Debtor's assets and liabilities provided in the two documents, filed only 12 days apart, and signed under penalty of perjury, vary so widely in the facts stated.

By its Statement of Affairs of Debtor Engaged in Business, we were informed that Debtor's business was the operation of a gas station, truck stop, mini-mart and restaurant, and that it began in June 21, 1984. We were further informed, in response to Question 2(c) and (d), that all of Debtor's books and records were available for inspection and examination. In response to Question 12 of the Statement of Affairs, Debtor stated that it was, at the time of the filing, a defendant in a case entitled Wright Companies v. Wilde Horse & C. Mitchell, an action to collect on an open book account. Further, Debtor stated, Wright, by use of a pre-judgment writ of attachment, seized the sum of $751 from the Debtor prior to the filing of the petition.

Answering Question 17 of the Statement of Financial Affairs, Debtor stated it rented its business premises on a month-to-month basis from a Charles A. Mitchell, Jr. In the A–3 Schedule, Charles A. Mitchell, Jr. is listed as a general unsecured creditor in the sum of $48,000 for "back rent". [Note: The "back rent" debt was apparently not included in Debtor's original debt figure because the amount is larger than the $28,909 total debt first reported. Why would Debtor's President forget its unpaid rent when it is largest unsecured debt?].

In response to Question 21 of the Statement of Financial Affairs, we were informed that the shareholders of Debtor are Charleen Mitchell, who owns 60% of the shares, and Charles A. Mitchell, Sr. who owns 40% of the shares; however, Charles A. Mitchell, Sr. is listed as "deceased". [Never has the Court been informed as to when the death occurred, nor has the Court been given any information as to the disposition of the decedent's shares of stock].

It is of interest to note that in Schedule B–2(f), where Debtor listed its four motor vehicles, all the vehicles were listed as being registered to "C. Mitchell". At no place in the Debtor's file is there any information as to whether the "C. Mitchell" referred to is Charleen Mitchell, Debtor's President and the 60% shareholder; Charles A. Mitchell, Sr., the deceased 40% shareholder; or Charles A. Mitchell, Jr. Debtor's landlord, the son of Charles A. Mitchell, Sr., and as we learned later, the "boyfriend" of Debtor's president, Charleen Mitchell.

Moreover, while General Motors ("GMAC") is listed as a secured creditor having an interest in three of Debtor's listed vehicles, the original master mailing list submitted by Debtor failed to list GMAC, and therefore GMAC failed to receive notice of the 341(a) hearing. Likewise, because Debtor failed to list any secured creditors on its original master mailing list, the following creditors failed to be informed of Debtor's filing and the date, time and place of the Section 341(a) hearing: Aztec Signs, Bob Bolin, Canawil of California, Canyon Capital, Charles A. Mitchell, Jr., Colonial Pacific Leasing, Dept. of Motor Vehicles, Donald and Heidi Mathias, General Motors, Haninger & White Insurance, Imperial Thrift & Loan, Nissan Motor Acceptance, San Bernardino County Air Pollution Control District, Valley Lumber, Hickory Inc., Industrial Leasing, State Farm Insurance, Rampart Security, and others. There is no evidence in the file that Debtor ever took any steps to remedy this defect.

Finally, in its Statement of Financial Affairs, Debtor acknowledged that within a year prior to its filing, it consulted with attorneys other than Ms. Bernstein, including Fullerton & Lemann (also known as Fullerton, Lemann & Schaefer) and Elbert Muncy, Esq. Fullerton, et. al. was paid $1,500 7 days prior to the filing, and Muncy was paid $3,000 3 days before the bankruptcy.

## U.S. TRUSTEE'S MOTION TO DISMISS OR CONVERT THE CASE

On April 18, 1991, the Office of the United States Trustee filed a motion seeking to have the Debtor's case dismissed or converted. The bases of the motion included that, while the case had been pending for approximately 10 months: (1) no plan and disclosure statement had yet been filed; (2) the insurance binder was outdated; (3) Debtor had failed to file interim and operating reports for the months of January, February, March and April 1991; (4) no U.S. Trustee quarterly fee had been paid for the first quarter of 1991; and (5) postpetition taxes and tax returns had not been delivered to the State Board of Equalization ("SBE"). The U.S. Trustee's motion was set for hearing on May 15, 1991.

On May 10, 1991, Debtor filed an untimely response to the U.S. Trustee's motion, alleging in general, that all the U.S. Trustee filing requirements had been timely met, and that all tax returns and taxes had been delivered to the SBE except for the first quarter of 1991 which was just now due. At the hearing on May 15, 1991, the U.S. Trustee and Debtor agreed that the motion to dismiss would be denied on certain conditions not relevant here.

## MOTION TO DEEM UNEXPIRED LEASE REJECTED

While the Chapter 11 petition was filed on June 8, 1990, and even though Debtor's business was totally dependent upon possession of its rented or leased premises, at no time did Debtor file a motion to assume the unexpired lease or to extend time to assume or reject such lease. However, on April 23, 1991—nearly 11 months after the filing—landlord Charles A. Mitchell, Jr. filed a motion for an order that the lease of the premises be deemed rejected. In the motion, movant, without any supporting declaration or any proper introduction of documentary evidence, asserted that a written lease agreement for a term from October 1, 1988 to September 30, 1990 had previously been entered. A copy of the alleged agreement was attached to the motion. [It is of interest to note that neither the document nor the signatures on it were dated. Moreover, the lease agreement con-

tained a provision giving the lessee an option to extend the lease term for an additional two years. There is no evidence that Debtor exercised its option to extend the lease term].

Landlord's motion further asserted that Debtor owed $48,000 in pre-petition rent and $24,000 in post-petition rent; no specific facts as to the dates of the missed payments was given, but it might be inferred that the missed payments were for the months of February, March and April 1991 at $8,000 per month.

[Note: With respect to rent payments, it is of interest to note that according to the last interim statements filed by Debtor with the Office of the U.S. Trustee, and signed by Debtor's President, and dated for the periods of February, March and April 1991, show Debtor's general account balances were $13,518.00, $4,044.88 and $7,368.11 respectively, for a total of $24,930.99. This demonstrates at least two things: (1) Debtor apparently had the funds to make the rental payments, and (2) had Debtor made the rent payments, its total profit after 11 months in Chapter 11 would have been less than $8,000 ($1,000 in the general account, $2,000 in the payroll account, and approximately $5,000 in cash)—hardly an income or fund sufficient to propose a plan of reorganization in a case reporting $143,000 in general unsecured debt. And, as set forth below, that sum fails to include (1) the $227,000 claim filed by Wright Companies for fuel sold and delivered (filed in September 1990); (2) the $1.55 million claim of the State Board of Equalization (filed in April 1991); and, (3) the $291,000 claim by the IRS (filed in September 1990). None of these claims was objected to by the Debtor].

Landlord's motion came on for hearing on May 15, 1991; Debtor filed no written opposition to the motion, and in fact Debtor agreed to the rejection and order to surrender the property back to the landlord. The motion was granted and an order entered on June 3, 1991.

## HEARING ON DEBTOR'S PROPOSED SALE OF ASSETS

On June 10, 1991, Debtor filed an application for authority to sell all of its assets.

It stated, in general, that while the landlord obtained relief to re-take the premises, he was holding off the taking to give the Debtor an opportunity to sell its assets. The application, which was not accompanied by any declaration in support of the facts alleged, stated that the cost value of the assets to be sold was approximately $24,000. Thereafter, the Debtor stated that it had received an offer to purchase the assets for a sum of $7,000 from Kingston Range Enterprises, Inc. A copy of the proposed purchase and sale agreement was attached to the Application; it contained no signatures, and there was no indication on the document as to the identity of the persons who would sign the agreement.

Not only was the motion to sell not accompanied by a declaration filed in its support, but neither did Debtor file any points and authorities setting forth the legal grounds upon which such sale outside the ordinary course of business could be approved. Such a memorandum is required under Local Rule 111, and, as set forth below, is required by the circumstances themselves, i.e. a proposal to sell all of Debtor's assets from a Chapter 11 estate without a confirmed liquidation plan.

The hearing on the application to sell assets came on July 10, 1991. While attorneys for the landlord and proposed buyer appeared, Debtor's attorney failed to appear. During the hearing, the Court asked, without any prior information, whether the proposed sale was an "arm's length" transaction or whether there was any relationship between the buyer and the seller. It was at that time that the Court and others were first informed that the 100% shareholder of Kingston Range Enterprises, Inc., the proposed buyer, was Charles A. Mitchell, Jr.—son of the deceased shareholder Charles A. Mitchell, Debtor's landlord, and the "boyfriend" of Debtor's President. The close connection between the principals of the buyer and Debtor was not revealed in the application to sell. [Note: The Court later determined

that Kingston Range had been incorporated on March 22, 1991]. The hearing was continued to July 18, 1991 to obtain more information regarding the sale].

## CONTINUED HEARING OF DEBTOR'S APPLICATION TO SELL

On July 12, 1991, the Court issued and served an order that the Debtor file a declaration in support of its proposed sale which would inform the Court and others of certain information, including: (1) identification of Debtor's officers, directors, and shareholders; (2) identification of the officers, directors, and shareholders of the proposed buyer, Kingston Range; (3) a full disclosure of the relationship(s) between the buyer and Debtor and any of their principals, officers and/or directors; (4) a full inventory of all items proposed to be sold with values; (5) a detailed summary of all marketing efforts by Debtor to sell the assets; and (6) a statement of the reasons the sale should be made without a confirmed plan.

In attempted compliance with the above order, on July 16, 1991, a "faxed" copy of a Declaration of Charleen Mitchell was filed with the Court. In her declaration Ms. Mitchell asserted that she is the 60% shareholder of Debtor, that the 40% shareholder is deceased, and that there have been no probate proceedings [ostensibly to determine the disposition of Charles A. Mitchell, Sr.'s shares of stock]. She further stated that the bankruptcy was prompted by the acts of Wright Oil Companies in attaching Debtor's bank account [according to the Statement of Financial Affairs, Wright got $751], and by the large debt to the IRS [recall that no debt to the IRS was listed in the original petition or the A Schedules].

Ms. Mitchell's declaration thereafter lapsed into several unsolicited paragraphs regarding the Debtor's post-petition dispute with the SBE which alleged Debtor owed $1.3 million in unpaid fuel taxes. Finally, Ms. Mitchell stated that she made *no* efforts to market the assets of Debtor, and that "Frankly I don't know who would want to buy it", and thereafter she concludes: "I have seen the offer ... and I

think the creditors would be wise to take it. I doubt they will get more from anyone else." One of the several curious things about Ms. Mitchell's declaration is that while Debtor's attorney's name, Naomi R. Bernstein, and address appear at the top of the document, the document was *faxed to* Ms. Bernstein by another entity, and it appears to have been prepared by the offices of Fullerton, Lemann & Schaefer, by Michael R. Schaefer, Esq., the attorneys representing proposed buyer Kingston Range. [This fact has further significance when we recall that the law firm of Fullerton & Lemann, aka Fullerton, Lemann & Schaefer, was listed in Debtors' Statement of Financial Affairs as having been consulted by Debtor within a year prior to the filing of the bankruptcy and receiving money from Debtor within a week of the filing. The firms prior representation or consultation with Debtor was not mentioned in the application to sell].

On July 17, 1991, Attorney Michael R. Schaefer, appearing for Kingston Range, filed a document entitled "Memorandum of Points and Authorities in Support of Motion to Approve Sale of Assets". The document, however, cited no legal authority in support of its points. At the same time, Mr. *Schaefer's office* filed the "original" declaration of Charleen Mitchell referred to above; the document had a proof of service attached to it showing it was *served upon* Debtor's attorney, Ms. Bernstein! [This is a curious fact, since Ms. Bernstein's name, as counsel of record, is at the top of the document. It is apparent that the preparer wanted to convey the impression that the document was prepared by Ms. Bernstein]. From this, the Court has reason to conclude that the declaration of Ms. Mitchell, Debtor's principal, was prepared by the attorney for the proposed buyer of the assets, Kingston Range, i.e. Michael R. Schaefer.

Also, on July 17, 1991, a Declaration of Charles A. Mitchell, Jr. was filed with the Court. In his declaration, Mitchell averred that he is the sole shareholder of Kingston Range Enterprises, Inc., the proposed buyer, and he is the owner of the real property

where the premises are located. He also stated that Debtor was formed by is father, Charles A. Mitchell, and his "girlfriend", Charleen Mitchell. Finally, he said is not a shareholder, officer or director of Wilde Horse. [But he failed to reveal that he was apparently an "employee" of Debtor since he received a weekly Wilde Horse payroll check.]

Moreover, Mr. Mitchell stated that his only prospect to keep his real property was to take over "Wilde Horse" in the hope of producing enough income to pay the debt service on the property. He said the property location is such that there are no buyers for it, and that his offer to buy the assets of the estate is in Debtor's interest because he is offering "almost" $.50 on the wholesale dollar.

## ORDER THAT ATTORNEY NAOMI R. BERNSTEIN APPEAR AND EXPLAIN

Also in its order of June 12, 1991, the Court ordered that Ms. Bernstein appear on July 18, 1991, and explain to the Court, with respect to the application to sell debtor's assets, why: (1) no declaration had been filed in support of the application; (2) no points and authorities were filed; and (3) the Court and all parties in interest were not informed of the relationship between the proposed buyer and Debtor.

At the hearing on July 18, 1991, Ms. Bernstein did appear. The Court commented to, or questioned, Ms. Bernstein, and she responded, as follows:

Court: "If you didn't know of the relationship between the Debtor, its principal and the buyer, the Court would be very surprised. Why was the relationship not revealed?"

Bernstein: "I didn't know the full details of the corporation, the ah, make-up of the corporation."

Court: "That would have required a reasonable inquiry, would it not?"

Bernstein: "I should have taken a more active part in the sale. *I merely sat back* and I apologize to the Court. I just plain sat back, and *I let everybody else take care of it* (the sale)—*the oth-*

*er attorneys involved* (the Court assumes she meant the attorneys for the buyer). My client was just not—*it just didn't matter*—*on the sale.* As far as Wilde Horse goes, as far as the principal of Wilde Horse, there was no hope of salvaging the principal's liability (the Court infers she meant to say 'equity'), there was no hope of salvaging the corporation, it was extremely frustrating case because we had such a good company, and the SBE, in my opinion, invented law to close them down." (Emphasis added).

Court: "I don't want to be side-tracked about the SBE—My question is what did you do or not do?"

Bernstein: "What *I did was let my frustration,* and—, take over and *I sat back and didn't do anything. I did not investigate, I didn't question.* I received a buy-sell agreement, and I noticed it. I should have taken a more active role. My only excuse was that I was so thoroughly frustrated and upset with loosing what should have been a good case." (Emphasis added).

## APPLICABLE STATUTORY LAW

*Bankruptcy Code § 330, Title 11, U.S.C. § 330.*

(a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award ... to the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such ... attorney ... based upon the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

*Bankruptcy Code § 328(c), Title 11, U.S.C. § 328(c).*

(a) ....

(b) ....

(c) ... [T]he court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, *at any time during* such professional person's *employment* under section 327 or 1103 of this title, such professional person is not a disinterested person, or *represents* or holds *an interest adverse* to the interest of the estate with respect to the matter on which such professional person is employed. (Emphasis added).

*Local Bankruptcy Rule 102(5).*

Any attorney who appears for any purpose submits to the discipline of the Court with respect to conduct of the case or proceeding and shall be subject to the standards of professional conduct as set forth in Local Rule 2.5 of the District Court.

*Local District Court Rule 2.5.*

Each attorney shall become familiar with and comply with the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the decisions of any court applicable thereto. Those statutes, rules and decisions are hereby adopted as the standards of professional conduct of this Court.

*Rules of Professional Conduct of the State Bar of California Rule 5–102(b).*

Avoiding the representation of adverse interests.

(A) ...

(B) A member of the State Bar shall not represent conflicting interests, except with the written consent of all parties concerned.

*Rules of Professional Conduct of the State Bar of California Rule 6–101(2).*

Failing to act competently.

A member of the State Bar shall not wilfully *or* habitually

(1) ...

(2) Fail to use reasonable diligence and his [or her] best judgment in the exercise of his skill and in the application of his [or her] learning and effort to accomplish, with reasonable speed, the purpose for which he [or she] was employed. (Emphasis added).

## DISCUSSION

### BURDEN OF PROOF ON ATTORNEY'S FEES APPLICATION

■ The burden of proof is upon the applicant to establish the reasonableness and allowability of its requested fees. *In re Wildman*, 72 B.R. 700, 708 (Bankr. N.D.Ill.1987); *In re Harman Supermarket, Inc.*, 44 B.R. 918, 920 (Bankr.W.D.Va. 1984); *In re Four Star Terminals, Inc.*, 42 B.R. 419, 429 (Bankr.Alaska 1984).

### COURT'S DUTY TO REVIEW FEE APPLICATION

■ Congress intended the Court to have the responsibility for the payment of attorney's fee from debtors' estates. *In re First Federal Corp.*, 43 B.R. 388 (Bankr. W.D.Va.1984). Bankruptcy Judges have an independent duty, regardless of whether or not objections are filed, to (1) conduct an examination into the reasonableness of professional fees to be paid from an estate, and (2) articulate principled reasons for granting or denying compensation. *Matter of Ross*, 94 B.R. 210 (M.D.Ga.1988); *In re Watson Seafood & Poultry Co., Inc.*, 40 B.R. 436 (Bankr.S.D.Fla.1984); *In re Crutcher Transfer Line, Inc.*, 20 B.R. 705 (Bankr.W.D.Ky.1982). In addition to a review for reasonableness, the Court has a duty examine all aspects of an attorney's fee application, *In re CVC, Inc.*, 120 B.R. 874, 876–7 (Bankr.N.D.Ohio 1990), citing *In re Liberal Market, Inc.*, 24 B.R. 653 (Bankr.S.D.Ohio 1982), including "... a duty ... [to] root out impermissible conflicts of interest...." *In re Martin*, 817 F.2d 175, 180 (1st Cir.1987) ["We hold unhesitatingly that § 327 remains hirsute"!]. The duty to "root out", however, does not impose upon the Court a duty to search the file for possible same surnames or other indicia of conflicts or adverse interests.

*See In re Career Concepts, Inc.,* 76 B.R. 830, 834 (Bankr.Utah 1983).

## FIDUCIARY DUTIES OF CHAPTER 11 DEBTOR'S ATTORNEY

■■■ In a Chapter 11 proceeding, the attorney for debtor in possession, as an officer of the court charged to perform duties in the administration of the case, has a high fiduciary duty to the estate represented. *Matter of Evangeline Refining Co.,* 890 F.2d 1312, 1323 (5th Cir.1989); *Matter of Consol. Bancshares,* 785 F.2d 1249, 1255 (5th Cir.1986); *In re Doors and More, Inc.,* 126 B.R. 43, 45 (Bankr. E.D.Mich.1991), citing *In re Bohack Corp.,* 607 F.2d 258, 264 (2nd Cir.1979); *In re Consupak, Inc.,* 87 B.R. 529, 548–49 (Bankr.N.D.Ill.1988); *In re Grabill Corp.,* 113 B.R. 966 (Bankr.N.D.Ill.1990); *In re Coastal Equities, Inc.,* 39 B.R. 304, 309 (Bankr.S.D.Cal.1984). Moreover, counsel for a corporate Chapter 11 debtor in possession owes a fiduciary duty to the corporate entity estate—the client—and represents *its* interests, not those of the entity's principals. *In re Grabill Corp., supra,* 970; citing *In re Overmeyer Telecasting Co.,* 23 B.R. 823, 931 (Bankr.N.D.Ohio 1982), aff'd, 750 F.2d 31 (6th Cir.1984); and others omitted; *In re WPMK, Inc.* 42 B.R. 157 (Bankr.Hawaii 1984). And certainly, the attorney is obligated to act not in his or her own best interest, but in the best interest of all the creditors. *In re Doors and More, Inc.,* at 45, citing *Commodity Futures Trading Comm'n. v. Weintraub,* 471 U.S. 343, 105 S.Ct. 1986, 1194, 85 L.Ed.2d 372 (1985), and others omitted.

■■■ An attorney's "client" is the person or entity on whose behalf the lawyer acts. In certain proceedings an attorney may have more than one client, and where this is so, they owe duties of loyalty to all the interests represented. The duty of loyalty includes a duty of candor—candor to all the interests represented. "A lawyer like a trustee is bound to higher standards than the morals of the marketplace." *MGIC Indemnity Corporation v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986). "Professional ethics requires of a lawyer a decent sense of responsibility to all those he [or she] serves." *Id,* at 504.

■■■ Because the attorney for debtor in possession is a fiduciary of the estate and an officer of the Court, the duty to advise the client goes beyond responding the client's requests for advice. It requires an *active* concern for the interests of the estate, and its beneficiaries, the unsecured creditors. Consequently, the attorney may not simply close his or her eyes to matters having a legal and practical consequence for the estate—especially where the consequences may have an adverse effect. The attorney has the duty to remind the debtor in possession, and its principals, of its duties under the Code, and to assist the debtor in fulfilling those duties. *See In re Consupak, Inc.,* 87 B.R. 529, 548–551 (Bankr.N.D.Ill.1988); *In re Sowers,* 97 B.R. 480, 488 (Bankr.N.D.Ind.1989). What's more, counsel has a duty to assist and advise debtor respecting the fulfilling of the requirements of the Office of the United States Trustee; unwillingness to do so disqualifies the attorney's representation of debtor. *In re Plaza Hotel Corp.,* 111 B.R. 882, 891 (Bankr.E.D.Cal.1990).

■■■ An attorney retained by the trustee, or debtor in possession, who assists with the collection of the assets of the estate, must abide by the highest professional standards. "Not honesty alone, but the punctilio of an honor the most sensitive, is the standard of behavior." *In re Thompson,* 54 B.R. 311, 315 (Bankr. N.D.Ohio 1985), quoting Judge Cardozo in *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928).

■■■ An attorney's duty goes beyond not merely putting false evidence before the court; the duty is greater—the lawyer has a duty to not make misrepresentations to the court. *In re Disciplinary Action Curl,* 803 F.2d 1004, 1005–06 (9th Cir.1986). For disciplinary purposes in the Ninth Circuit, where an attorney has misrepresented the record on appeal to the Court, no finding of intentionally wrongful conduct is required to impose a sanction; a finding of a lack of diligence by the attorney is suffi-

client. *DCD Programs, Ltd. v. Leighton,* 846 F.2d 526 (9th Cir.1988).

## ATTORNEY'S DUTY OF REASONABLE INQUIRY

■ All attorneys before the federal court, including those representing the estate of a debtor in possession, have duties under F.R.C.P. 11 (incorporated into the Bankruptcy Code as Federal Rules of Bankruptcy Procedure Rule 9011). The Rule provides, among other things, that the signature of an attorney on a petition, pleading or motion constitutes a certificate that to the best of the attorney knowledge, information or belief "formed after reasonable inquiry", the content of the document is "well grounded in fact and is warranted by existing law...." The "well grounded in fact" requirement demands, at least, that the attorney not accept the client's (or the client's principal's) version of certain facts "on faith", but at a minimum the attorney has a duty to probe the client carefully for the facts before they are included in any document signed by the attorney or in any other way presented to the Court. See *Fleming Sales Co. v. Bailey,* 611 F.S. 507, 519 (D.C.Ill.1985).

## CHAPTER 11 DEBTOR'S ATTORNEY'S DUTY RE: PROPOSED SALE OF ASSETS

■ Under § 363(b), the debtor in possession may sell property of the estate, other than in the ordinary course of business, only after notice and hearing. In any sale of estate assets, the ultimate purpose is to obtain the highest price for the property sold. *Matter of Chung King, Inc.,* 753 F.2d 547 (7th Cir.1985); *In re Alpha Industries, Inc.,* 84 B.R. 703, 705 (Bankr. Mont.1988); 2 Collier on Bankruptcy, 15th ed. ¶ 363.03[1].

Under what circumstances should the debtor in possession be allowed to sale of all or virtually all of the estates property prior to the confirmation of debtor's plan? This was the fundamental question raised and discussed in *In re Lionel Corporation,* 722 F.2d 1063 (2nd Cir.1983). *Lionel,* stands for the notion, at least, that § 363(b)

does not grant the bankruptcy judge *carte blanche* to approve any sale proposed by the debtor, but requires that "reasons be given for whatever determination is made", *Id.* at 1069, i.e. "[T]here must be some articulated business justification ... before the bankruptcy judge may order such disposition." *Id.* at 1070. The "notice and hearing" safeguard of § 363(b) would be meaningless if the court were not required to articulate some reasons why the sale is in the best interest of the estate.

Of course, the court and the creditors can only make an "articulated business" judgment regarding the prudence of the sale where there has been a full disclosure of the details of the proposed sale by its proponent. "The key to the reorganization Chapter ... is *disclosure....*" *Id.* at 1070. The essential purpose served by disclosure is to ensure that parties in interest are not left entirely at the mercy of the debtor and others having special influence over debtor.

■ A sale of substantially all of debtor's property outside the ordinary course of business, and without a Chapter 11 disclosure statement and plan, must be closely scrutinized. *In re Channel One Communications, Inc.* 117 B.R. 493 (Bankr.E.D.Mo.1990). In proposing any such sale, the debtor has the burden of demonstrating that it is in the best interests of the estate. *Lionel,* at 1071; *Channel One,* at 496.

■ In approving any sale outside the ordinary course of business, the court must not only articulate a sufficient business reason for the sale, it must further find it is in the best interest of the estate, i.e. it is fair and reasonable, that it has been given adequate marketing, that it has been negotiated and proposed in good faith, that the purchaser is proceeding in good faith, and that it is an "arms-length" transaction. *Matter of Phoenix Steel Corp.,* 82 B.R. 334, 335–36 (Bankr.Del.1987); *In re Alpha Industries, Inc.,* 84 B.R. 703, 705–06 (Bankr.Mont.1988); *In re Alves,* 52 B.R. 353 (Bankr.R.I.1985); *In re Delaware & Hudson Railway Co.,* 124 B.R. 169, 176–77 (D.Del.1991); *In re Planned Systems, Inc.,*

82 B.R. 919, 923 (Bankr.S.D.Ohio 1988). It is the proponents duty to produce evidence probative of these issues.

"Good faith" encompasses fair value, and further speaks to the integrity of the transaction. Typical "bad faith" or misconduct, would include collusion between the seller and buyer, or any attempt to take unfair advantage of other potential purchasers. *Alpha Industries*, at 706. And, with respect to making such determinations, the court and creditors must be provided with sufficient information to allow them to take a position on the proposed sale. *In re Structurlite Plastics Corp.*, 91 B.R. 813 (Bankr.S.D.Ohio 1988).

Finally, the court must determine that the debtor in possession has given all interested parties adequate and reasonable notice regarding the sale. *In re Delaware & Hudson Railway Co.*, 124 B.R. at 176.

## ATTORNEY'S DUTY TO DISCLOSE INSIDER PURCHASER OF DEBTOR'S ASSETS

■ As set forth above, one of the factors in determining the *bona fides* of the proposed sale of debtor's assets is a determination that the transaction proposed has been negotiated at arms-length. A sale is fraudulent where, through personal as opposed to arms-length dealing, property of the estate is obtained at the lowest price as opposed to a higher price, and where the relationship between the seller and buyer has been concealed. *In re Tri–Cran, Inc.*, 98 B.R. 609, 618–619 (Bankr.Mass.1989). Typically, the misconduct that would destroy the *bona fides* of a proposed sale is fraud, collusion, or an attempt to take grossly unfair advantage. *In re Apex Oil Co.*, 92 B.R. 847, 869 (Bankr.E.D.Mo.1988).

■ It is not bad faith *per se* for an insider to purchase property from an estate, even where the insider has a fiduciary duty to the estate. *Id.*, at 869–70, citing *In re Andy Frain Services, Inc.*, 798 F.2d 1113, 1125 (7th Cir.1986); *In re Naron & Wagner, Chartered*, 88 B.R. 85, 88 (Bankr. Md.1988); and *In re Ancor Exploration Co.*, 30 B.R. 802, 808 (Bankr.

N.D.Okla.1983). The question of good faith, even under these circumstances however, turns on whether debtor breached its fiduciary duty of full disclosure. The court in *Apex* found no lack of good faith where the purchase and sale agreement was the product of "[V]igorous, arms-length, good faith negotiations ..." which took place in a "... 'fish bowl' under the watchful eyes of the Examiner and the Committee...." *Id.*, at 870.

Under § 101(30) an "insider" includes, if the debtor is a corporation, an officer of the debtor, the person in control of the debtor, or a relative of a person who is an officer or person in control of the debtor corporation. The word "includes" is intended to connote that the definitions under the section are not limiting. 11 U.S.C. § 101(3). "The true test of an 'insider' is one who has such a relationship with the debtor that their dealing with one another cannot be characterized as an arms-length transaction." *In re Montanino*, 15 B.R. 307, 310 (Bankr.N.J.1981); *In re Hollar*, 100 B.R. 892, 893 (Bankr.N.D.Ohio 1989).

■ Clearly then, a debtor who proposes a sale of all of its assets to an insider must fully disclose to the court and creditors the relationship between the buyer and seller, as well as the circumstances under which the negotiations have taken place, any marketing efforts, and the factual basis upon which the debtor determined that the price was reasonable.

## CONDITIONS UNDER WHICH DEBTOR'S ATTORNEY'S FEES MAY BE DENIED

### 1. REPRESENTING AN INTEREST ADVERSE TO THE ESTATE

■ Attorneys have a duty to exercise independent professional judgment, free from conflicting and compromising influences; the interests of no other person should affect the attorney's basic judgment and responsibility to the client. *In re WPMK, Inc.*, 42 B.R. 157 (Bankr. Haw.1984).

■ Under § 328(c) the Court may deny attorney's fees where, during the appointment, the attorney has represented an interest adverse to the interest of the estate. "To 'represent an adverse interest' means to serve as agent or attorney for any individual or entity holding such adverse interest." *In re Roberts*, 46 B.R. 815, 827 (Bankr.Utah 1985). Through § 328(c) the Congress has expressly provided a penalty to be applied against attorneys who either have, or represent, interests in conflict with those of the estate. HR Rep No. 595, 95th Cong, 1st Sess 329 (1977); S.Rep No. 989, 95th Cong, 2d Sess 39 (1978), U.S.Code Cong. & Admin.News 5787 (1978).

■ An Attorney who fails to remain free of conflicts, or one who serves conflicting interests during a case may be denied *all* compensation. *In re Land*, 116 B.R. 798, 803 (D.Col.1990); *BH & P, Inc.*, 103 B.R. 556 (Bankr.N.J.1989). A conflict exists where the attorney represents interests in a proceeding of both the debtor and a creditor. *In re Roberts*, 46 B.R. 815, 823 (Bankr.Utah 1985). "The interests of any other person should not affect an attorney's judgment and responsibility to his[or her] client." *In re 765 Associates*, 14 B.R. 449, 451 (Bankr.Haw.1981). Counsel for the debtor may represent only the debtor— he or she may not also represent the interests of a purchaser of assets of an estate. *In re Watson Seafood & Poultry Co., Inc.*, 40 B.R. 436, 442 (Bankr.S.D.Fla.1984).

In *In re CVC, Inc.*, 120 B.R. 874 (Bankr. N.D.Ohio 1990) an accounting firm, Ciuni & Panichi, Inc. ("Ciuni") was appointed by order of the court to perform accounting services for debtor in possession. About six months later, Ciuni was hired by William Gardner, a party interested in buying CVC's assets, to perform accounting services for him. At the time of Ciuni's acceptance of the Gardner engagement, CVC and Gardner were in negotiations regarding the prospective sale. Ultimately, Gardner purchased CVC's assets.

Later, Ciuni filed a fee application in the bankruptcy case. The creditor's committee objected to the payment of fees on the ground that the services rendered were not a benefit to the estate, but benefited only Gardner. Among the work billed was for research on tax limitations on net operating loss carryforwards and unused business credit carryforwards as a result of a change in ownership. The committee further asserted that it was Ciuni associate Bradford Eldridge, who performed the most significant CVC work, that Gardner claimed was *his* accountant in the sale negotiation meetings.

Notwithstanding the committee's later withdrawal of its objection to the fee application, the court denied fees to Ciuni *in their entirety*, and in addition discharged Ciuni from its engagement to CVC. The court said:

"The conflict of interest in dealings of this nature is obvious. While the objective of CVC would be to maximize profits for the Debtor's estate in a sale, Gardner, on the other hand, would attempt to purchase CVC at a price most advantageous to himself. While serving as the accountant for both parties, Ciuni would experience great difficulty in serving the best interest of either party." *Id.* at 877.

In a similar matter, *In re Freedom Solar Center, Inc.*, 776 F.2d 14 (1st Cir.1985), the First Circuit held that corporate debtor's attorney could not also represent the debtor's sole shareholder, where the shareholder was attempting to purchase assets from the debtor's Chapter 7 estate. To allow such representation would be a violation of the state code of professional conduct proscribing the representation of differing interests, unless each represented party consents to the representation *after full disclosure*. In this instance, said the Court, there were clearly differing interests being represented. On the one hand, the attorney's duty to the debtor would be to seek to sell debtor's property for the highest price possible, and on the other, the duty to seek to purchase the same property at the lowest possible price. This adversity alone, said the Court, was a *prima facie* showing of the violation of the code of conduct. "The Rule", said the First Circuit, "is meant to avoid the possibility that [the attorney] will succumb to temptation and

give tainted advice. It is beside the point that the tainted advise may not have any effect on the debtor's conduct. Lawyer's should not give such advice." *Id.*, at 18. The Court thereafter held that the rule against representing adverse interests, even where the situation may be characterized as slight, should be strictly adhered to in order to prevent escalating conflicts. Debtor's attorney was found to be disqualified. Certainly, the representation by Debtor's attorney of an undisclosed adverse interest in a Chapter 11 debtor in possession sale of assets is deserving of much greater scrutiny than in a Chapter 7 case, because under Chapter 7 the proponent of the sale in generally the Trustee—a neutral party who has an independent fiduciary duty to the estate.

## 2. BREACH OF FIDUCIARY DUTY

 The Court may deny an attorney for a Chapter 11 debtor all fees claimed as due and owing on account of such attorney's wrongdoing, negligence, or serious breaches of fiduciary obligations. *Red Carpet Corp. of Panama City Beach v. Miller*, 708 F.2d 1576 (11th Cir.1983); *Matter of Ranchero Motor Inn, Inc.*, 527 F.2d 1044 (9th Cir.1975); *Matter of Arlan's Dept. Stores, Inc.*, 615 F.2d 925 (2nd Cir. 1979). "Improper conduct on the part of officers or attorneys has frequently been penalized by withholding compensation or reimbursement or both". *Matter of Ranchero Motor Inn, Inc.*, 527 F.2d 1044, 1047 (9th Cir.1975), citing 3A Collier on Bankruptcy par. 62.05[5], p. 1431. Moreover, the Court has the flexibility to tailor the relief necessary to remedy an attorneys misconduct. *In re Guy Apple Masonry Contractor, Inc.*, 45 B.R. 160, 168 (Bankr. Ariz.1984), citing *Matter of Ranchero Motor Inn, Inc.*, 527 F.2d 1044, 1047–48 (9th Cir.1975).

 Violations of the Code or professional ethics or breaches of fiduciary duties can give rise to the reduction, denial or forfeiture of compensation or other sanctions. *In re Command Services Corp.*, 102 B.R. 905, 911 (Bankr.N.D.N.Y. 1989), other cites omitted. Ethical violations are relevant to fee determinations for lawyers representing a Chapter 11 debtor in possession. *In re Global Marine, Inc.*, 108 B.R. 998, 1004 (Bankr.S.D.Tex.1987).

## 3. BREACH OF DUTY OF COMPETENCE

 While ethical violations are a factor to be considered by the court on fee applications, the *absence of competence* should be the *primary focus*, and where unethical conduct has lessened the value of the services rendered the fee should be reduced. *In re Devers*, 12 B.R. 140 (D.C.D.C.1981); *In re Coastal Equalities, Inc.*, 39 B.R. 304 (Bankr.S.D.Cal.1984).

 Section 327 requires that prior to the employment of an attorney for the trustee, the bankruptcy court should determine whether there is any conflict of interest by that attorney, whether the attorney is competent and whether the services are needed. *In re Kroeger Properties and Development, Inc.*, 57 B.R. 821, 823 (9th Cir.BAP 1986); *In re Samoan Airlines, Inc.* 70 B.R. 352, 354 (Bankr.Haw.1987); *In re Johnson*, 21 B.R. 217, 218 (Bankr.D.C. 1982). If the Court is required to determine that the attorney is "competent" prior to employment, then surely actual competence in performing services after employment must be a mandatory factor in awarding fees. It is axiomatic that where, prior to awarding professional fees under § 330(a)(1) the Court must make a finding of the value of the services rendered, the Court determines that the services were incompetently performed and therefore have no value, then such services cannot be compensated.

 Competent representation of one's client is a part of an attorney's ethical responsibility to his or her client; failure to act competently wilfully *or* habitually, such as by the failure to use reasonable diligence and his or her best judgment and skill in the application of one's learning, is a breach of the attorney's fiduciary duty to the client. See Rules of Professional Conduct of the State Bar of California, Rule 6–101(2). Under California law, gross carelessness and negligence are violations of

the attorney's oath to faithfully discharge one's duties to the best of his or her knowledge and ability; such gross violations involve moral turpitude because they are a breach of the fiduciary relationship that binds the attorney to the most conscientious fidelity to the client's interests. *Simmons v. State Bar of California*, 2 Cal.3d 719, 87 Cal.Rptr. 368, 470 P.2d 352 (1970).

Finally, as earlier stated, debtor in possession's attorney may be denied fees where he or she violates his or her fiduciary, ethical and professional responsibilities to the client.

### 4. BREACH OF DUTY OF REASONABLE INQUIRY

As set forth above, all attorney's before the federal court, have duties under F.R.C.P. 11. The failure by debtor's attorney to make a reasonable inquiry may be severe, because where the Court determines that a pleading or motion or document is signed in violation of Rule 9011, it "... *shall* impose upon the person who signed it, the represented party, or both, *an* appropriate *sanction* ..." i.e. the imposition of sanctions is mandatory.

■ This court concludes that where the document or documents signed by debtor's attorney are such that they are false or misleading, or were signed in breach of an attorney's fiduciary duty to the estate, an appropriate sanction under Rule 9011, among others, is the denial of attorney's fees either with respect to the fee relating to the preparation of, and hearing related to, if any, the "signed" document, or to such attorney's compensation *in toto* where the breach is substantial and goes to the heart of good faith and fair-dealing, i.e. to the heart of the attorney's fiduciary, ethical and professional responsibilities to debtor in possession's estate.

### 5. BREACH OF DUTY OF DISCLOSURE WHEN REPRESENTING ADVERSE INTERESTS

■ There is nothing improper in representing more than one party to a transaction, so long as the attorney discloses the consequences of the joint representation. *E.F. Hutton & Co. v. Brown*, 305 F.Supp. 371 (S.D.Tex.1969). However, an attorney should not represent parties whose interests are adverse. *In re Briggs' Estate*, 139 Cal.App.2d 802, 294 P.2d 478 (1956). Adversity of, or divergent, interests between two clients requires the attorney who attempts to represent both, to exercise the highest duty to each to make full disclosure,—to disclose to each of the jointly represented clients whatever is necessary to enable each of them to make intelligent, informed decisions regarding the subject matter of the representation. *Spindle v. Chubb/Pacific Indem. Group*, 89 Cal.App.3d 706, 152 Cal.Rptr. 776 (1979); *Klemm v. Superior Court of Fresno County*, 75 Cal.App.3d 893, 142 Cal.Rptr. 509 (1977).

### TOTAL FORFEITURE OF FEES IS WITHIN THE COURT'S DISCRETION

■ A total forfeiture of compensation to the attorney for a debtor in possession is within the sound discretion of the court. *In re Warrior Drilling & Engineering Co. Inc.*, 18 B.R. 684 (D.C.Ala.1981); *In re Command Services Corp.*, 102 B.R. 905 (Bank.N.D.N.Y.1989); *Matter of Davidson*, 79 B.R. 859 (Bankr.W.D.Mo.1987); *In re Damon*, 40 B.R. 367 (Bankr.S.D.N.Y.1984).

### ANALYSIS

■ With respect to the proposed sale of Debtor's assets, Ms. Bernstein admitted to the Court and others on the record that she did nothing to investigate the *bona fides* of the transaction. Rather, she simply "sat back", "didn't do anything" and "let everybody else [meaning buyer's attorneys] take care of it" [meaning the negotiation, terms and conditions of the sale]. She summarized: "I did not investigate, I did not question".

Such conduct, given Counsel's fiduciary duty to the estate, was reprehensible. Ms. Bernstein has admitted that she wilfully breached her duty because she was "frustrated". These admitted violations of her

fiduciary, ethical and professional duties is alone sufficient to deny her fees in this case. But, there is more.

By "signing" the application to sell Debtor's property Ms. Bernstein knowingly falsified her "certification" as an office of the Court that she performed her duties to her client. Moreover, when she "signed" at a time when she had no reason to believe the proposed sale was an "arms-length" transaction, she was, and in effect, "standing behind" a sale the terms and conditions of which were dictated by the proposed buyer—this when she should have known of the close relationship between Mr. Mitchell and Ms. Mitchell, and should have suspected collusion between the two for their own benefit to the detriment of the estate. In so doing, Ms. Bernstein herself "sponsored" and represented to the Court an interest at least potentially, if not actually, adverse to the estate without any disclosure whatsoever.

From the Court's experience, Ms. Bernstein's admission of "sitting back and doing nothing" describes her entire representation in this case and other cases she has handled, or mishandled, before this Court. While not licensed to practice medicine, this Court believes that Attorney Bernstein is "legally" blind—she never seems to see perfectly obvious "red flags".

Specifically, there were "red flags" throughout this case which should have, but apparently did not, capture Counsel's attention. The first, perhaps, was the substantial disparity between the first and later reports of the value of Debtor's liabilities and assets. Simple common sense would require closer questioning and review thereafter of the information reported to counsel by Debtor's principal.

Next, I believe, would be the question of who owned the shares of the deceased Charles A. Mitchell, Sr. Did Ms. Bernstein ask whether there was a will? Whether Mr. Mitchell Sr. died intestate? Who the decedent's survivors are? Why didn't she ask such questions?

Whose name was on the title to the vehicles? Did Ms. Bernstein know and willfully permit a misrepresentation of actual title by preparing bankruptcy schedules listing the ambiguous name "C. Mitchell"? Or did she just sit back and not make an inquiry regarding Debtor's property.

What questions were addressed, and to whom, and what steps were taken, if any, by Ms. Bernstein regarding the rental or lease agreement on the Wilde Horse premises? Why wasn't the landlord's apparent lack of activity in the case a "red flag"? If, as Mr. Mitchell reported in his declaration, his only prospect of saving his property was to "take over" Wilde Horse, why didn't he file an unlawful detainer proceedings against Wilde Horse prior to the bankruptcy when Wilde Horse was $48,000 in arrears on its rent? What early inquiries did Ms. Bernstein make of Mr. Mitchell regarding his intentions? Why did Ms. Bernstein not know of a written lease agreement? Why when she discovered there was a lease agreement, didn't she bring the matter of Ms. Mitchell's (and perhaps Mr. Mitchell's) misrepresentations to her, and in the bankruptcy case, to the attention of the Court?

It is this Court's experience that it is the landlord or mortgage holder in a Chapter 11 case that is generally the first either to "work out" something with the Debtor or run to Court for relief. When the landlord didn't take either of these steps, why didn't Ms. Bernstein make some probing inquiries? As was pointed out in *In re Doors and More, Inc.*, 126 B.R. 43 (Bankr. E.D.Mich.1991), a Chapter 11 case, an attorney's failure to deal with the landlord may well result in a disaster to the debtor, its owners and the creditors of the estate. This is so, of course, because under § 365(d)(4), where the debtor in possession has failed to assume the unexpired lease of its business premises within 60–days after the filing of the petition, the lease is deemed rejected, and the debtor must surrender possession to the landlord. In most cases, such an unplanned ejectment is catastrophic to the debtor's ability to continue business. Such a failure on the part of debtor's attorney can hardly aid the administration of the estate. *Id.* at p. 46.

Wasn't the "boyfriend/girlfriend" relationship between Mr. Mitchell and Ms. Mitchell a "red flag"? Didn't it occur to Ms. Bernstein that Mr. Mitchell might actually be "in control" of Debtor? Especially where Mr. Mitchell was (1) the landlord who could have at any moment in the case "pulled the plug" with respect to the premises; (2) the son of the deceased shareholder (and perhaps his sole heir); and (3) the largest unsecured creditor? What did Ms. Bernstein make of the facts that (1) Mr. Mitchell was an employee of Wilde Horse during the case?, and (2) Ms. Mitchell would remain at "Wilde Horse" as an employee after all Debtor's assets were sold?

Did Ms. Bernstein make inquiries regarding Debtor's prior legal representation? And especially where two attorney's were paid for their services immediately prior to the filing of the bankruptcy?

Why did Ms. Bernstein not cry "foul" to the Court on behalf of the estate when she learned the proposed purchaser, Kingston Range, was represented Fullerton & Lemann when she knew Fullerton & Lemann had apparently consulted with the Debtor immediately prior to the filing?

There may in fact be answers to all these questions which can explain that this case was "legit"—but because Ms. Bernstein never provided the Court and creditors with "full disclosure", we will never know.

The Court finds from the evidence before it that Ms. Bernstein either (1) knew of the collusive and undisclosed relationships in this case and knowingly participated in misleading the Court and creditors; or (2) didn't know of the collusive and undisclosed relationships in this case, and is therefore wholly incompetent because she insisted on remaining ignorant of the facts and law applicable to her case notwithstanding the numerous indicia of questionable conduct along the way. Whether Ms. Bernstein's acts were wrongful, wilfully incompetent or grossly negligent is not important to the determination here. Under either case, the Court concludes her fees must be denied in their entirely, she should not be permitted to represent debtors in possession before any bankruptcy court, and her conduct in this case must be referred to the State Bar of California for disciplinary proceedings.

## POST–SCRIPT

At a later hearing on another matter where the question of her representation in this matter was raised, Ms. Bernstein looked at the Court quizzically and seemed to ask—"But what could I have done? This case came to me as an 'emergency'—I didn't have time to ask the questions I would like to, and I can only put in the petition, schedules and statements the information given to me by the client."

The prepetition answer comes from our own Ninth Circuit Bankruptcy Appellate Panel in *In re Villa Madrid,* 110 B.R. 919 (9th BAP 1990) where the Court said:

"The importunities of a desperate client do not relieve an attorney of the affirmative duty of reasonable inquiry imposed by Rule 9011. The evident warning flags and the inadequate time available to make such inquiry should have impelled [the attorney] to consider the ever-present option of declining a questionable engagement." *Id.* at p. 924.

The post-petition answer is that on the very first hint or suspicion that the debtor or debtor's principal is not being honest, or is neglecting his/hers/its fiduciary duty to the estate, it is the attorney's duty to first ask *probing* questions and *demand full and reasonably corroborated responses,* and then if counsel is still unsatisfied or ethically uncomfortable, immediately bring the unresolved concerns to the Court's attention by way of a motion to be relieved as counsel of record or in some other way. The wholly unacceptable response is to do nothing and continue in the engagement "looking the other way". Counsel does so at his or her personal and professional peril.

## CONCLUSION

For all the foregoing reasons, the application for fees and reimbursement of costs of Debtor's attorney, Naomi R. Bernstein, is denied in its entirety. Moreover, Ms.

Bernstein will immediately be ordered to disgorge from her trust account and deliver to the Chapter 7 trustee, within 10 days of entry of this order, the full retainer sum of $6,500.00.

A separate order denying attorney's fees to Naomi R. Bernstein shall be filed concurrently herewith.

Finally, this memorandum will be referred to the State Bar of California and the Bar of the Central District of California with respect to the apparent breaches of duty to the Debtor herein, Wilde Horse Enterprises, Inc. by both Ms. Bernstein and the firm of Fullerton and Lemann, represented by Michael R. Schaefer, Esq.